IOWA PUBLIC SERVICE COMPANY, a corporation, appellant, v. CITY OF SIOUX CITY and members of City Council, appellees.

## No. 50712.

(Reported in 128 N.W.2d 248)

548

May 5, 1964.

Sifford & Wadden, of Sioux City, and Barnes, Wadsworth, Elderkin, Locher & Pirnie, of Cedar Rapids, for appellant.

Shull, Marshall, Mayne, Marks & Vizintos, of Sioux City, for appellees.

STUART, J.—The plaintiff, Iowa Public Service Company, hereinafter referred to as the company, brought an action against the City of Sioux City, Iowa, and the members of the council, hereinafter referred to as the City, to enjoin the enforcement of an ordinance setting the rate for natural gas in Sioux City on the ground that it did not provide a fair rate of return to the company and was therefore confiscatory and unconstitutional. The trial court held the ordinance unconstitutional, but the company's victory was nominal only since the trial court, at a subsequent refund hearing, required the company to refund to the Sioux City customers $624,705 of the $628,005 it had collected in increased rates under an injunction bond. The

trial court also fixed the rate of refund to apply to money collected after the refund period.

The company appealed from this Refund Order and the findings of fact and conclusions of law in the main case which were carried over in principle to the refund hearing, and relies upon these propositions:

"1. The court erred in its determination as to the amount of accrued or existing depreciation on both the reproduction cost and the original cost of the property.

"2. The court adopted and used erroneous principles in its determination of depreciation expense and erred in its determination of depreciation expense.

"3. The court erred in failing to permit as an operating expense the amount actually expended by Iowa Public Service Company for natural gas purchased for and used by the consumers in Sioux City.

"4. The court erred in computing the income tax on the gas operations of Iowa Public Service Company in Sioux City and applied improper methods in its computation."

The City cross-appealed stating three propositions which we will number:

"5. The court erred in including the oil-gas plant in the rate base, and in carrying this error over to include the cost of operating and maintaining the oil-gas plant as an operating cost to be considered in its computation of refunds.

"6. The court erred in its computation of outside **rate case** expense (1) by amortizing such expense on a 5 year rather than a 10 year basis; (2) by charging as expense $41,142 which was not incurred or paid during the refund period; and (3) in failing to take an average of rate case expense at the beginning and end of the refund period in its determination of the amount to be amortized.

"7. The court erred in allowing interest on the principal amount of refund at a rate of 5% rather than 6%."

The company is an Iowa corporation with its principal offices in Sioux City, Iowa. It furnishes gas and/or other utilities to approximately 235 communities in Iowa, Nebraska and South Dakota. Its operations are divided into three districts,

Eastern, Western and Sioux City District. The Sioux City District consists of the City of Sioux City and the surrounding area including South Sioux City, Nebraska. We are concerned here with the gas rates in Sioux City only.

■■ The ultimate goal in any rate case is to determine if the rates fixed by ordinance are just and reasonable, yielding the company a fair return on the fair value of the company's property used and useful in producing the public service at the time and for the area under consideration, without placing an excessive burden on the consumer. Iowa-Illinois Gas and Electric Co. v. City of Fort Dodge, 248 Iowa 1201, 1229, 85 N.W.2d 28, 44 (hereinafter referred to as Fort Dodge); Iowa-Illinois Gas and Electric Co. v. City of Iowa City, 255 Iowa 1341, 1349, 124 N.W.2d 840, 845 (hereinafter referred to as Iowa City). The purpose of the refund hearing is to determine the amount of damages, if any, sustained by the consumer from the increased rates charged by the company during the injunctive period. The refund should consist of the amount collected by the company in excess of a fair rate of return.

As this appeal from the Refund Order is based upon findings of fact and conclusions of law contained in the main case, the evidence introduced in the main case is of utmost importance and the record contains all pertinent testimony and exhibits before the trial court at that time. In reaching the ultimate goal, we must determine (1) what is a fair return? In this case the parties have stipulated 6 percent to be a fair return and this is not an issue. (2) What is the present fair value of the company's property which is used for and useful to the consumers in Sioux City? Involved here are the company's appeal from the court's determination of accrued depreciation (point 1) and the City's contention that the oil-gas plant should not have been included as used and useful (point 5). (3) What revenue should be credited to consumers in the city? This is agreed upon. (4) What are the proper items of expense chargeable against this revenue either directly or by allocation? This involves the determination of proper annual depreciation expense (point 2); the determination of the correct cost of natural gas consumed in Sioux City (point 3); the proper

method of allocating income tax (point 4) ; and the amortization of rate case expense (point 6).

I. Present fair value is the most basic and important single figure which must be determined in cases of this nature. "As a general rule we must consider any value a fair value which fair and reasonable men would say ought to be attached to the property, under all the circumstances of the particular case, for the purpose of measuring a return which the public should pay to the owner." Fort Dodge, page 1232 of 248 Iowa, page 46 of 85 N.W.2d. It "is not a single figure at which we can arrive by the application of a certain formula. We must and do fix it here as a judged figure." Fort Dodge, page 1238 of 248 Iowa, page 49 of 85 N.W.2d. Opinions and estimates of experts are necessary aids to the court in forming its judgment as to the present fair value.

In the Fort Dodge case original cost figures and estimates of reproduction cost properly weighted and depreciated were adopted as guides to aid the court in arriving at its decision. "Since neither original cost nor trended original cost nor reproduction costs are final ends in themselves, but only guides to judgment in arriving at 'fair value', precise mathematical figures are not mandatory." Fort Dodge, page 1226 of 248 Iowa, page 42 of 85 N.W.2d.

The company's original cost figures and its engineer's estimates of reproduction cost are not in issue on this appeal, nor is any question raised on the trial court's judgment in weighting original cost 30 percent and reproduction cost 70 percent. Trends present at the time of the Fort Dodge case have continued and the same weighting was recently approved in the Iowa City case.

The dispute which affects present fair value in this case involves the percentage of accrued depreciation by which the weighted evaluation of original and reproduction cost should be reduced to arrive at the present fair value. The company contends that the percentage of accrued depreciation on original cost should be determined by the company's reserve, which in this case would have been 30 percent. It also contends that accrued depreciation on reproduction cost should be based upon

"observed depreciation" estimated by their engineer from visual inspection and many other studies which need not be detailed.

The City applied the composite of present rates of depreciation used by the company to the age of the property for both original and reproduction costs and arrived at an accrued depreciation of 36.68 percent on original cost and 57.6 percent on reproduction cost. Mr. C. M. Stanley, basing his judgment on these percentages and other factors, arrived at an overall accrued depreciation of 40 percent which the trial court accepted. He said:

"On Exhibit 'R' I have summarized the accrued depreciation which was computed on the utility's Sioux City gas properties as of August 31, 1959, both for original cost and reproduction cost. The original cost accrued depreciation is 36.68 percent of the original cost as shown on line 3 of Exhibit 'R', and the reproduction cost accrued depreciation is 57.67 percent of the reproduction cost of the Sioux City gas property as shown on line 6 of Exhibit 'R'.

"Having available the above analyses, the determination of the proper amount of accrued depreciation to be used in arriving at fair value is a matter of judgment. In arriving at my conclusions I have reviewed and considered Mr. Patterson's estimate of accrued depreciation on reproduction cost using the observation method, and Mr. Anderson's statement of book reserve for depreciation on an original cost basis. I have given predominant weight to the accrued depreciation estimates of Mr. Dunton which are summarized on my Exhibit 'R', because they are based on the straight-line method which was approved by the Iowa Supreme Court in the Fort Dodge case.

"It is my conclusion that a reasonable estimate of accrued depreciation as applied to the utility's property used and useful in serving Sioux City gas customers for both periods is 40 percent."

Accrued depreciation is as much a matter of judgment as most of the other factors considered in arriving at fair value. Original cost figures are the only known amounts which are helpful. The depreciation reserve, while mathematically accurate as a bookkeeping procedure, is the amount accumulated by the

company over a period of years based upon the estimated life of company property during which it expects to recover back the original cost. It may or may not have some relationship to the present value of the property, depending upon the accuracy with which the life of the property was estimated. The reserve is material evidence and a factor to be considered, in judging the accrued depreciation, but the company's estimate should not be binding. A company should not be in a position to build up a quick reserve by charging excessive depreciation and then expect a revaluation to show a greater value remaining, therefore the fair value of original cost should not exceed the depreciated value as shown by the reserve account. At the same time, the consumer should not be penalized by a management error which failed to take adequate depreciation, and therefore the value may be less than the accumulated reserve.

Accrued depreciation on reproduction cost is purely an estimate and a matter of opinion. Many factors are involved. We are looking for the proper fair value. The trial court accepted Mr. Stanley's judgment on this matter and we feel his judgment was also most nearly accurate. We are therefore not inclined to change the 40 percent accrued depreciation figure as determined by the court.

II. The company takes issue with the method by which the trial court computed the annual depreciation expense. He applied the company's current rate of depreciation of 2.444 percent to the present fair value found in the main case plus improvements. The total depreciation expense allowed for the two-year refund period was $374,002. The company claims annual depreciation using this rate of return should have been computed on the undepreciated value of the weighted reproduction—original cost figures or by dividing the present fair value by the number of service years remaining and cites as authority the Iowa City rate case. The City supports the trial court's position that it followed the method prescribed in the Fort Dodge rate case. We must therefore examine these authorities.

In Fort Dodge we said at page 1243 of 248 Iowa, page 52 of 85 N.W.2d:

"Allowance for depreciation as an operating expense should

be based upon present value rather than on original cost. In support of this conclusion the Texas court said: 'The item of depreciation of a given piece of property appearing in current expenses for rate purposes should be closely correlated with the "fair value" appraisal of the same piece of property from year to year, and the whole should be consistent.' Railroad Commission v. Houston Natural Gas Corp. (1956), 289 S.W.2d 559, 572. Logic also would seem to compel that result. It would do the utility company no good to set its rates on the fair present value base if the base is then to be ignored and the value represented in the base annually eroded away by refusal of adequate annual depreciation expense allowance.

"We are content to accept the 2 percent figure on all gas property and to apply it on the present valuation. In other words, we must continue to allow the same rate of depreciation on the present property value as was allowable upon the original investment. *This will permit amortization on the fair present value over its remaining life.*" (Emphasis added.)

The computation set out in that opinion shows we allowed 2 percent depreciation on the present fair value, or the value of the property after accrued depreciation had been deducted.

In Iowa City we state (page 1346 of 255 Iowa, page 843 of 124 N.W.2d): "We approve the trial court's decision as to annual depreciation of the electric plant, on the 3 percent of present value basis, and approve the court's computation of the depreciation amount on the basis of the approximate number of years the property will still be in use."

The trial court did not, however, compute the depreciation at the rate of 3 percent on the present fair value. After referring to the language quoted above from the Fort Dodge case, the trial court said:

"This undoubtedly means that after the fair present value has been determined, then the company has a right to have the consumers pay an adequate amount for the property, used and useful, which is included in the fair present value at any particular time over the remaining service life of the property so used and useful and included in the fair present value for the test year.

"Fair present value might vary from time to time, but as with original cost, the system would be the same; only the amounts will be different. Once fair present value is arrived at and the same rate that the company is presently using for depreciation is used to arrive at annual depreciation expense, then that rate should be used on the undepreciated fair value which is the figure arrived at after proper weighting and not depreciated by accrued depreciation, then and in that event, by using the company rate over the estimated life of the property by which the annual rate is arrived at, then at the end of the estimated life the customers would pay and the company would recover the full cost of the property used and useful.

"The proper figure for annual depreciation can be arrived at in any one of three ways. (1) Take the figure of fair value undepreciated and apply the company's present rate of depreciation for group property over the estimated life; (2) take the present fair value, which is the value after deducting accrued depreciation, and divide into that present fair value the remaining number of years of estimated life of the group property, or (3) determine the percent of depreciation to be applied to present fair value by dividing the remaining number of years of estimated life of the property into the 100 **percent which** would give you the percent per year to be applied to the remaining property. * * *

"By any of the three methods we reach the figure of $340,233, which is the figure the Court is using here. The Court feels very certain this is what our Supreme Court must have had in mind in allowing annual depreciation on the fair value rather than original cost and insisting that the rate be set in order that the company should recover the value of its property over the remaining service life thereof."

The computation contained in our opinion in the Iowa City case shows that we used one of the methods suggested by the trial court as the depreciation allowed is not 3 percent of the present fair value, but is actually the present value divided by 23⅓ years or the remaining life.

It is obvious from the statements in the Fort Dodge case that we intended to provide an annual depreciation figure by

which the company could recover the present fair value over the remaining life. It is fair that it be allowed this rate of depreciation in order to recover part of the restoration costs. We say:

"We are not by this conclusion adopting the rule that the company is only entitled to a simple return of capital invested, for we feel its right properly considered should be the right of restoration. The balance of restoration costs may be obtained by proper depreciation of present value on its extended future life. It cannot be recovered on past life or value previously paid for by the customer as operating expense. These payments should, if properly accounted for by the company, be reflected in its depreciation reserve." (Page 1242 of 248 Iowa, page 52 of 85 N.W.2d.)

In the instant case, according to the City's own computation, the application of the company's present rate of depreciation to the present fair value would result in a depreciation expense of only $22,893 per year more than allowed on original cost alone as compared with $146,253 which is the additional amount necessary to recover present fair value over the remaining life.

It is true, as the City contends, that the 2 percent rate of depreciation set in the Fort Dodge case was figured on the present fair value, and as there remained only 36.25 years of the estimated life of 50 years, the company would only recover 72.50 percent of the fair value during that period of years. However, the decision does not say the 2 percent depreciation should be limited to the years remaining based upon the original estimate. It indicates the remaining life of the property is greater than originally estimated. We say:

"From the record before us we are convinced the original life estimated by the company was too low and that these facilities which have received excellent maintenance will give a much extended service period. Sufficient value still remains to provide adequate replacement under a proper revaluation." (Page 1242 of 248 Iowa and page 52 of 85 N.W.2d, supra.)

It is inequitable to refuse to permit the company to recover fair value over the remaining service life of the prop-

558

erty. It is just as inequitable to require the consumer to pay higher rates because the company has depreciated the property at too fast a rate. If the remaining life exceeds the present rate of depreciation, the rate should be reduced in order that full recovery will not be achieved prior to the end of the service life.

For these reasons it is not necessary for the percentage of accrued depreciation and the percent of service life remaining to equal 100 percent. Accrued depreciation is used as a guide in arriving at fair value. The percent by which the weighted reproduction—original cost figure is reduced to reach fair value is affected by many factors in addition to the percentage of useful life consumed. These include the matters mentioned by Mr. Stanley. In annual depreciation the company is allowed to recover the present fair value of the property over its remaining service life. In other words, the mere fact that a property has depreciated in value 40 percent from its weighted cost does not mean that it necessarily has 60 percent of its service life remaining. The service life may be more or less depending upon the condition of the property. The service life in the Fort Dodge case must have been extended so that the present fair value would be recovered over the next 50 years instead of the years remaining on the original estimated life.

There is nothing in this record to indicate that the remaining service life is different from that represented by the current rate of depreciation. It should be set to allow recovery of the fair value over the remaining service life. In the absence of a showing to the contrary we will assume this rate does so.

We therefore compute the allowable annual depreciation expense as follows:

Weighted Original—Reproduction cost.
Reproduction cost 14,776,004 × 70% = $10,343,203
Original cost        6,425,855 × 30% =    1,927,756

Undepreciated weighted cost          $12,270,959
Add improvements found by trial court     239,078

                                     $12,510,037

| | | |
|---|---|---|
| × current rate of depreciation | | .02444 |
| Annual depreciation | $ | 305,745 |
| Two-year refund period | $ | 611,490 |

III. One of the principal sources of controversy between the parties is the production and storage facilities in Sioux City referred to as the Kellogg plant. Prior to 1950 this plant was the sole source of gas for Sioux City. Since June of that year almost all gas requirements have been satisfied by natural gas purchased by the company from Northern Natural Gas pipeline. The Kellogg plant consists of an old, but well maintained oil-gas plant and a liquid petroleum (LP) plant added since 1950. The company claims the plant is used and useful to the Sioux City District as a "peak shaving plant" · enabling the company to contract with the pipeline for less than the maximum demand of the district and as 92 percent of the district demand is in Sioux City, 92 percent of the present fair value of the plant should be included in the present fair value base of the company's property used and useful to the City. The City recognizes the advantages of a "peak shaving plant", but contends (1) the propane facilities are sufficient to meet the needs and that the oil-gas plant is not "used and useful" (2) that if the plant is determined to be used and useful, the City should only be allocated 60 percent of the fair value of the plant because the company contracts with the pipeline for a demand including many cities outside the Sioux City District all of which benefit from the plant, and the City should only be charged with the proportion of the value of the plant equivalent to its share of the contracted demand for the "Billing Group". The trial court found the entire plant to be used and useful, which resulted in the City's appeal on point 5. The trial court refused to apportion the fair value of the plant in ratio to the contract demand of the "Billing Group" but did reduce the City's figure for cost of gas purchased for Sioux City by 40 percent of the "peak saving shavings" resulting from the reduction in the contract amount because of the availability of this gas producing plant. This theory was not advanced by

either party at the trial and resulted in the company's appeal on point 1. During the refund period alone this holding involves $236,149.

To make this proposition meaningful to anyone outside the gas utility business, we must discuss in detail the method of operation. Gas purchased from a pipeline by the company is paid for by a two-part rate. One part is the "contract demand" which is a monthly rental paid to the pipeline company for the assurance that the amount of gas contracted for will be available at all times. It is the substantial part of the rate and at the time of this case the charge was $3.85 per thousand cubic feet (mcf) of gas contracted for. This contract demand charge is payable monthly regardless of how much gas is actually used. The other charge is the "commodity charge" and is based on the amount of gas actually used. At the time of trial the commodity charge was 22.4c mcf. As gas cannot be shared, the company must be assured that it will at all times have a supply of gas available to meet its maximum demand by a contracted demand, or some other means. A drop of gas pressure in the mains could cause pilot lights to go out and result in an inefficient and dangerous situation.

A large portion of gas consumption is for heating, and therefore the demand is highly seasonal. While the company must have gas available for the coldest day of the year, it would be very expensive to pay the monthly contract price based upon this volume of gas. One way to reduce the contract demand is through the sale of gas to interruptible customers. These are commercial and industrial users, who, for a reduced rate, are willing to purchase gas only during nonpeak periods. They receive no gas during peak periods and ordinarily have an alternative source of fuel. Customers who must depend upon the company for gas during the peak period, mainly householders, are called firm customers. A second way to reduce the contract demand is through the use of secondary production facilities. The Kellogg plant can add 7200 mcf of gas to the supply per day, if needed. Therefore, the company was able to reduce the contract demand for the Sioux City District by 7200 mcf per day below the estimated maximum demand re-

sulting in a savings to the Sioux City District of about $340,000 per year.

For the past several years gas has been available from the pipeline on days when the actual demand exceeded the contract demand and the pipeline did not have to restrict the Sioux City District to the contract demand. Therefore, the plants have not actually been operated except for testing periods. There is a very heavy penalty if the contract demand is exceeded when the contract demand limit has been placed in effect by the pipeline.

As previously stated, the City concedes the value of the peak shaving plant, but contends the propane-air plant will produce 7200 mcf per day itself and the oil-gas plant serves no purpose. The company replies that the storage capacity of the propane-air plant is sufficient for only 45 hours of maximum demand and the oil-gas plant is necessary to be prepared for longer cold periods which have been experienced in the past. The propane-air plant can produce during the time the oil-gas plant is becoming operative. There is much more storage space available for oil, and an additional supply would be available during a long cold period when there would be no assurance that additional propane could be obtained. It would cost about $1,100,000 to replace the present oil-gas storage facilities with equivalent propane storage tanks. The witness who testified for the City stated he would gamble and take a calculated risk on the sufficiency of the supply from the propane system and the availability of gas from the pipeline without penalty.

The trial court said:

"Without minimizing in any way the City's witness and his testimony, the court may not disregard the plain fact that this is essentially an internal management problem having been considered by men of long experience in the gas-producing and distributing field, and to whose testimony this Court must give substantial weight, relative to the necessity to maintain such plant in an operative condition.

"The evidence of the company preponderantly substantiates that the oil-gas producing plant is a part of the used and useful property of the company."

562

We agree with the trial court.

IV. The City urges in the event the oil-gas plant is determined to be used and useful, only 60 percent of its present fair value should be allocated to Sioux City as 26 communities served by the company were billed as a group and the contract demand of the whole group was reduced by the 7200 mcf production capacity of the Kellogg plant. The trial court accepted this argument to the extent of reducing cost of gas purchased for Sioux City by 40 percent of the "savings" brought about by reducing the contract demand for the entire group.

The Sioux City residents should not be charged with the whole present value of the plant if other communities in the district benefited from the reduced contract demand. However, the evidence establishes the other communities do not benefit from the Kellogg plant. The contract demand for each community in the billing group, with the exception of Sioux City, and probably Sheldon, which had its own peak shaving plant, is purchased in full. Only the contract demand for the Sioux City District is reduced. The total contract demand of this billing group is not prorated over the entire group. Each community pays for its own contract demand. The cost of gas to the Sioux City District is based upon its contract demand and the consumers benefit from the peak savings plant in the reduced cost of gas purchased. Ernest M. Raun, President and General Manager of the company, testified:

"By having the peak shaving facilities we afford protection to the firm customers on a day of maximum demand and at the same time save the firm customers considerable sums of money by reducing the contract demand charge. * * *

"The facilities of the manufactured gas plant in Sioux City are available for use only in the Sioux City District. Iowa Public Service Company has, therefore, made use of them to reduce the contract demand for the Sioux City District. The manufactured gas plant in Sioux City performs the function required of a peak shaving plant in that it provides stand-by facilities to meet the emergency needs for additional gas in periods of extreme cold weather when no other gas is available and by doing so renders unnecessary the purchase of sufficient

contract demand to meet such conditions. The result is a substantial saving in the cost of contract demand for the Sioux City District from which the firm customers in that district benefit.

"Northern Natural Gas Company's Billing Group No. 1 includes communities in the three states of Iowa, Nebraska and South Dakota and communities located in Price Zones 2 and 3 established by Northern Natural Gas Company. The States of Nebraska and South Dakota and their regulatory bodies cannot be controlled in any way by what is done in Iowa. Therefore, Iowa Public Service Company has found it necessary to purchase sufficient contract demand for the communities outside the Sioux City District in Billing Group 1 to meet maximum day conditions in those communities.

"The Sioux City District is the only place in the billing group where the contract demand has been cut down on account of the Sioux City peak shaving facilities, and thus the customers in the Sioux City District are the only ones in the billing group who get the benefit of the peak shaving plant."

The communities in the billing group benefit from the peak shaving plant indirectly as its availability within the billing group makes it possible for the group to purchase E.R.S. (Economy Replacement Service) gas at a special rate in amounts up to the production of the plant. The company cannot depend upon the availability of this surplus gas, however, as it can be obtained only on short notice "as, if and when" it is available from the Redfield underground storage reservoir. The company has made application to increase its contract demand commitments based upon this supply, which would further reduce the availability. It is of primary benefit to the interruptible customers furnishing gas to them at times when they would otherwise be cut off. It does not affect firm customers contract demand or rates.

Under these facts it appears that the allocation of a part of the value of the peak shavings plant to communities outside the Sioux City District would require them to pay a rate based upon facilities from which they receive no benefit. They have already paid the full contract demand for their needs. Adding depreciation on this plant to their expenses or charging them for 40

percent of the amount saved residents of the Sioux City District on its contract demand, would make them pay for gas not actually received or contracted for.

It therefore follows that the trial court was in error in reducing the cost of actual gas purchased by 40 percent of the "savings" during the refund period and the cost of gas to the Sioux City residents during that period should therefore be increased by $236,149, the amount deducted from the trial court from the actual purchases in making this adjustment.

V. Under the fourth proposition the company complains of the allocation of income tax expense made by the trial court and claims the error resulted in an excessive refund of $326,514. The trial court allocated the company's income tax to the City upon the ratio of the original cost of the company's gas property in Sioux City to the original cost of the company's entire property, citing the Fort Dodge case. The company made a computation of actual income from Sioux City during the refund period and computed the tax upon that income citing the Iowa City case.

The trial court in Fort Dodge allocated the income tax upon the ratio of gas property in Fort Dodge to total company property, saying:

"What is a fair way to ascertain the income tax? Public utilities differ from other industries in this: by regulation their return is directly tied to the value of their property. Hence the value of the property in a given district ought to reflect what income and what income tax are to be expected from and charged to that district. The value of the utilities' entire system is known, as is the value of its Fort Dodge property. The income tax for the entire system is known. Hence allocation of income tax to Fort Dodge or any class within Fort Dodge appears to be a matter of apportionment."

There is a difference of opinion between parties as to whether we had reference to this method on appeal when we said on page 1244 of 248 Iowa, page 53 of 85 N.W.2d:

"The general tax and depreciation expense are allocated by similar methods. Central office general tax expenses are allocated in the ratio used for apportioning central office property. With-

in the district and the area general tax expense is segregated in the proportions developed for allocating property. With the exception, then, of the present depreciation expense, we believe the methods and allocations arrived at by the trial court are reasonable and fair. There is no serious objection by appellee city to these sums, and they are adopted."

In any event, we either approved the trial court's allocation or neither party felt it was so unreasonable as to make an issue on appeal.

The trial court in the Iowa City case accepted the company's method of allocating the tax on the basis of computed income. He said:

"The court can see no reason why tax deductions based on income isn't a perfectly logical and reasonable figure to be accepted in fixing a fair rate base in this action, and I therefore adopt the company's figure based on income as an income tax deduction."

On appeal we approved this method of allocating income, stating:

"The allocation by the trial court of income tax expense is sustained by the evidence and we approve it." (Page 1347 of 255 Iowa, page 844 of 124 N.W.2d).

The trial courts in these two cases used different methods of allocating the income tax, both of which we accepted on appeal. In the Fort Dodge case the matter may not have been an issue. In the Iowa City case the determination was not essential to the result as the ordinance rate was held not to be confiscatory after the rate base was substantially reduced. It comes before us now as a direct and positive issue for our decision.

The company did not sustain its burden of proving allocation upon a property ratio is unreasonable. Both methods appear to be reasonable and supported by sound logic. It is surprising the different methods of allocation result in such divergent figures. This very fact causes us to question the advisability of adopting the company's allocation on income in this case. Ordinarily it would seem proper to base the income tax allocation on the income earned, but because of the peculiar nature of the

public utility and the fact that it is closely regulated and entitled to an income on the fair value of its property, it must be placed in a different category from an ordinary profit corporation. Utility income is tied directly to property values and a ratio of property values should therefore reflect the proper apportionment of the income tax. The company is entitled to a fair return on all of its properties. If we accept its figures the company in this instance obviously is not receiving a fair return in some locations or areas of operation. After the company's rates in Sioux City were increased to yield a fair rate of return, Sioux City accounted for a much larger proportion of the company's profits by actual figures than would be justified comparing the percentage of the property used and useful in Sioux City to the company's entire property. Apparently other areas of the company's operation are not making a fair return. The remedies to correct this situation are available to the company and if, for some internal reason, it chooses to let part of its operations function at less than a fair return, it should not be permitted to shift part of the resulting burden onto other areas which are already contributing a fair rate of return to the company. If the overall income tax burden were shifted to the areas which were already the most profitable, the consumer in those areas would be assuming part of the tax burden which should be borne by those areas which are not yielding a fair rate of return. While it might be more nearly accurate if an allocation could be made upon present fair value of the company's property rather than original cost, the expense of such appraisal would be prohibitive. Therefore in the absence of a showing to the contrary, we will assume the ratio of original costs is about the same as if based upon present values.

For these reasons it is our conclusion that the income tax should be prorated upon the income as it ought to be for a regulated utility and not upon the income from a particular area which is carrying its fair share. We therefore affirm the allocation of income tax as made by the trial court.

VI. In proposition 6 the City alleges the trial court erred in its computation of the expense of this rate case in three respects: (1) by amortizing it over a five instead of a ten-year

period, (2) by charging $41,142 in expense not incurred or paid during the refund period, (3) in failing to average the rate case expense at the beginning and end of the refund period to determine the amount to be amortized.

The trial court took the entire rate case expense incurred to the date of the hearing and divided it by 5 to get the amount to be amortized annually and doubled it to get the amount due for the two-year refund period ($143,893 ÷ 5 × 2 = $57,556). We agree with the use of the entire rate case expense, but believe it should have been amortized over a ten-year period as the trial court did in the Fort Dodge case. It is extremely doubtful that either the company or City would care to get involved in such an expensive proceedings in just five years. The utilities commission procedure should also provide a more satisfactory solution to rate problems than has been afforded in the past. We, therefore, reduce the rate case expense applicable to the refund period to $28,778.

VII. The City argues, since the company is permitted to make a 6 percent return on the fair value of its property, the consumers should be entitled to 6 percent interest on amounts to be refunded. It also refers to the fact that the Federal Power Commission authorized 6 percent interest on amounts refunded to the company by Northern Natural. As previously stated, a refund hearing is in the nature of an action for damages occasioned by the temporary injunction. Our statutory interest rate on money damages is 5 percent. Section 535.3, Code of Iowa. The interest was properly computed at 5 percent.

We do not believe there is a proper analogy between a 6 percent return on the operation of a public utility and money due in the refund. The rate of return to the public utility involves many factors besides a debt. Nor should the interest rate be affected by the rate authorized by the Federal Power Commission in a separate matter.

VIII. In summary, we hold the consumers of Sioux City are entitled to a refund on gas rates paid between January 1, 1960 and December 31, 1961, in the amount of $179,841. The accompanying table compares this opinion with that of the trial court and notes wherein they differ.

## SUMMARY OF OPERATING RESULTS
## Jan. 1, 1960, to Dec. 31, 1961

| Line No. | | | Trial court | Change | Opinion |
|---|---|---|---|---|---|
| 1 | Fair value: property | 7,362,575 | | | |
| | improvements | 239,078 | | | |
| | Working capital | 317,000 | 7,918,653 | None[1] | 7,918,653 |
| 2 | Revenue Received | | 12,333,993 | None | 12,333,993 |
| | Revenue needed to prevent confiscation | | | | |
| 3 | Depreciation | | 374,002 | 237,488[2] | 611,490 |
| 4 | Rate case expense amortized | | 57,556 | —28,778[3] | 28,778 |
| | Operating Costs | | | | |
| 5 | Purchased gas | | 7,162,591 | 236,149[4] | 7,398,740 |
| 6 | Distribution expense | | 845,875 | None | 845,875 |
| 7 | Gas production expense | | 85,983 | None | 85,983 |
| 8 | Collection expense | | 305,428 | None | 305,428 |
| 9 | Commercial (sales promotion) | | 57,401 | None | 57,401 |
| 10 | Administrative & General | | 487,504 | None | 487,504 |
| 11 | General taxes | | 858,745 | None | 858,745 |
| | For Return | | | | |
| 12 | 6% return per year for 2 years | | 950,238 | None | 950,238 |
| | Corresponding Inc. tax liability | | 523,970 | None[5] | 523,970 |
| | Total Revenue Needed | | 11,709,293 | 444,859 | 12,154,152 |
| | Total Revenue Received | | 12,333,993 | None | 12,333,993 |
| | Total Revenue Needed | | 11,709,293 | 444,859 | 12,154,152 |
| | Excess Revenue or Refund Due | | 624,700 | 444,859 | 179,841 |

1 Accrued depreciation (point 1 Div. I) Kellogg plant (point 5 Div. III)
2 Annual depreciation (point 2 Div. II)
3 Rate case expense (point 6 Div. VI)
4 Kellogg plant (point 3 Div. IV)
5 Income tax allocation (point 4 Div. V)

Therefore the decision of the trial court is hereby modified as herein set forth and remanded to the district court for judgment in accordance herewith. As the determination of refunds due after December 31, 1961, involves some adjustments, it can best be considered in the trial court. We direct the parties to cooperate with the trial court in computing the rate of refund due on the rates collected after December 31, 1961, applying the principles herein set forth.

The costs are taxed two thirds to the City and one third to the company, except that all printing costs in excess of $1.00 a page shall not be included as part of the costs and shall be paid for by the party which incurred it.—Affirmed in part and reversed in part on both the appeal and cross-appeal.

All JUSTICES concur.