**DAVENPORT WATER COMPANY,**
**Appellant,**

v.

**IOWA STATE COMMERCE COMMISSION**
**et al., Appellees.**

No. 54512.

Supreme Court of Iowa.

Sept. 27, 1971.
Rehearing Denied Nov. 8, 1971.

Lane & Waterman, Davenport, and Isham, Lincoln & Beale by Charles A. Bane, Chicago, Ill., for appellant.

Daniel J. Fay, Des Moines, and Reuben Goldberg and Leo J. Steffen, Jr., Washington, D. C., for appellee Iowa State Commerce Commission.

Durwood W. Dircks, Davenport, for appellee City of Davenport.

H. T. Lewis, Bettendorf, for appellee City of Bettendorf.

RAWLINGS, Justice.

Plaintiff public utility takes first impression appeal in this jurisdiction from trial court's affirmance, with one exception, of a water rate order issued by defendant state administrative commission. We affirm in part, reverse in part.

Davenport Water Company, a Delaware corporation (Utility), authorized to do business in Iowa, is engaged in providing water service to users in Davenport and Bettendorf (Municipalities).

Utility has furnished franchised service in Davenport since 1930 and Bettendorf since 1940.

Initially Utility was an Iowa corporation. In 1927 a predecessor to American Water Works Company, Inc. (American), obtained the original entity by stock purchase. In 1930 its properties were acquired by Utility which, in 1947, became a wholly owned subsidiary of American, largest investor owned water works holding corporation in the United States.

June 22, 1966, Utility filed with the Iowa State Commerce Commission (Commission), a proposed 50 percent service rate increase (public fire protection excluded) to be effective August 1, 1966.

July 18, 1966, Commission ordered suspension of the increase.

November 15, 1966, Utility placed the proposed rates in effect under a Commission approved customer refund bond.

December 23, 1966, Municipalities intervened in opposition to the Utility proposal.

March 1, 1967, Commission ordered hearings to commence April 4, 1967. They were concluded October 12, the same year.

The transcript of oral testimony consists of almost 4000 pages. Eighty-four exhibits were also introduced in evidence, comprising another 1000 pages.

By Commission's final order, issued October 9, 1968, Utility's proposed rates were held unreasonable.

Commission, with one of three members dissenting, accordingly cancelled Utility's proposed rate revision, authorized filing of new schedules providing an annual revenue increase of approximately 23 percent, as best determinable from the record, and directed that Utility submit a customer refund plan as to all collections in excess of Commission authorized rates, plus associated sales taxes, with interest at seven percent per annum.

November 4, 1968, Utility appealed to Scott County District Court and obtained a stay order under bond. May 15, 1969, hearing was held on that appeal, absent new or additional evidence. July 23, 1969, district court affirmed Commission on all points, except interest on customer refunds was ordered reduced from seven percent to five percent per annum. Appeal by Utility to this court followed.

As a preface to further consideration of this case it is appropriate to here circumscribe some of the basic terms presently involved.

■ "Rate base" represents the total investment in property, used and useful at time of the rate inquiry, in rendering a designated utility service. That figure is multiplied by a percentage called "rate of return" which orthodox regulation allows the utility to earn. See Pacific Telephone and Telegraph Company v. Hill, 229 Or. 437, 365 P.2d 1021, 1024; Application of Northwestern Bell Telephone Co., 78 S.D. 15, 98 N.W.2d 170, 176–177; 43 Am.Jur., Public Utilities and Services, § 82; 51 Iowa L.Rev. 283.

The methods most commonly employed in ascertaining a rate base are, (1) "original cost depreciated or prudent investment", (2) "present reproduction cost or fair value."

■ A rate base determined by "original cost depreciated or prudent investment" usually consists of original cost of the property used or useful in rendering services, plus working capital, less accumulated depreciation and contributions to construction and capital. This is ordinarily determined by an analysis of the utility's books and records. See, Hope Natural Gas Co. v. Federal Power Commission, 134 F.2d 287, 300–301 (4 Cir.); 2 Pond, Public Utilities, § 593 (4th ed. 1932); 51 Iowa L.Rev. 283.

■ Under "present reproduction cost or fair value" method the rate base is customarily derived by considering and evaluating original cost of a utility's existing facilities devoted to public service, present reproduction cost new of the facility less depreciation, and the amount and value of outstanding stocks and bonds. In effecting this computation, estimates based in part on price and labor indices, and extant values are commonly put to use. See Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819; Iowa-Illinois Gas & Electric Co. v. Fort Dodge, 248 Iowa 1201, 1229, 85 N.W.2d 28; 2 Pond, Public Utilities, § 594 (4th ed. 1932); 51 Iowa L.Rev. 284.

Commission instantly determined "fair value" testimony offered by Utility was too indefinite, speculative and uncertain to be of any probative force or effect, then applied the "original cost or prudent investment" formula. By so doing it concluded Utility's rate base was $10,237,844, and allowed thereon a return of seven percent or $716,649 annually, with operating expenses, including depreciation and taxes of $1,491,139. The foregoing rate base consisted of $11,589,729 undepreciated original cost of the plant in service December 31, 1966. From this there was deducted $4,861 representing contributions in aid

of construction; $6,500 nonutility plant; $102,593 accumulated deferred investment tax credits; $1,237,931 depreciation recorded on Utility's books, adjusted, for acquisition of the Bettendorf property.

On appeal to us, Utility contends trial court erroneously affirmed Commission in these respects:

## A. FAIR VALUE ISSUE

1. Rates allowed in such final judgment and order do not afford Utility a reasonable return upon the fair value of its property devoted to public service, are confiscatory, and cause Utility to be deprived of property without due process of law, in violation of Iowa Const., art. I, § 9.

2. Commission and district court, in adopting and approving a rate base for Utility, rejected all evidence regarding value of Utility's property devoted to public use, and instead employed the so-called investment rate base method, in violation of The Code 1966, Section 490A.8.

3. By rejecting all Iowa decisional rate-making precedents, and imposing confiscatory rates in violation of the Constitution and statutes of the State of Iowa, Commission and district court have denied Utility any relief from the debilatory effects of the long-continued and still-continuing inflation in the general economy.

## B. REPRODUCTION COST ISSUE

District court erred in affirming the following determination by Commission that reproduction cost evidence is *per se* incompetent:

"Finally, on this aspect of the case, we find and determine that reproduction cost evidence is not probative evidence of value and is, therefore, not a factor relating to value that this Commission is required to consider in fixing just and reasonable rates."

"The deficiencies and defects of reproduction costs are inherent in such appraisals and render them, and the 'fair value' method which depends on them, unworkable and unsound."

## C. ARBITRARY AND CAPRICIOUS ACTION ISSUE

District court erred in affirming the following rulings made by Commission which were arbitrary and capricious or otherwise illegal under § 490A.17 of the Iowa Code, because

1. Commission erroneously understated Utility's rate base in these particulars:

(a) By denying an appropriate addition to the rate base for the non-income-producing portion of Utility's committed construction program at end of the test year;

(b) By excluding from the rate base any allowance for materials and supplies.

2. Commission erroneously overstated the amount of operating income which Utility would receive from rates approved by Commission in the following particulars:

(a) By refusing to consider any deduction therefrom for Utility's charitable donations and contributions;

(b) By understating the amount of Utility's property taxes to be deducted therefrom through demonstrable error in calculation;

(c) By understating Utility's rate case expense to be deducted therefrom by calculating a federal income tax saving resulting from such expense at a higher rate than that found applicable to Utility by Commission;

(d) By understating Utility's federal income tax to be deducted therefrom by including as deductible in the computation of said tax the depreciation on property excluded by Commission from the rate base.

## D. TAX NORMALIZATION ISSUE

District court erred in affirming the disallowance by Commission of Utility's deduction for deferred federal income taxes, thereby further overstating operating in-

come which would be produced by the rates approved by Commission.

## E. RATE REFUND ISSUE

District court erred in affirming Commission's order which required a rate refund for the entire period from November 15, 1966, to October 9, 1968, although Commission, under § 490A.6 of the Iowa Code, lacked any rate refund jurisdiction over the period from August 1, 1967, to October 9, 1968, since Commission's power to suspend rates ceases 12 months from the date such rates would have become effective if not suspended.

I. *Utility Rates—Legislative Function.* At one time the various municipalities in Iowa were granted exclusive nonadministrative authority to fix local utility rates. The Code 1962, Chapter 397. See Iowa-Illinois Gas & Electric Co. v. Fort Dodge, 248 Iowa 1201, 1227–1228, 85 N.W.2d 28.

In 1963 this, as an administrative power, legislative in nature, was delegated to the Iowa State Commerce Commission. Regular Session, Sixtieth General Assembly, Chapter 286, presently identified as The Code 1971, Chapter 490A. See Iowa-Illinois Gas & Electric Co. v. Iowa City, 255 Iowa 1341, 1348, 124 N.W.2d 840; Iowa-Illinois Gas & Electric Co. v. Fort Dodge, *supra*, 248 Iowa at 1216–1217, 85 N.W.2d 28; Arizona Corporation Commission v. Superior Court, 107 Ariz. 24, 480 P.2d 988, 990–991; Pacific Telephone & Tel. Co. v. Public Utilities Com'n, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353, 360; 73 C.J.S. Public Utilities § 16a; 43 Am.Jur., Public Utilities and Services, § 83. See generally Davis, Administrative Law Text, § 5.01; 3 Pond, Public Utilities, §§ 892, 903 (4th ed. 1932); cf. Elk Run Telephone Co. v. General Telephone Co., 160 N.W.2d 311, 314–317 (Iowa).

II. *Judicial Review.* First to be determined is the scope of our review.

At the threshold The Code 1966, Section 490A.8, provides in material part: "The burden of proof shall be on the public utility to prove that no unreasonable profit is made."

■ This must mean, a presumption of reasonableness attends Commission's determined rate return, and the burden is upon Utility to prove otherwise.

As 43 Am.Jur., Public Utilities and Services, § 186, states:

"In general, a rate fixed by an authorized rate-making body for a public utility is presumed to be valid and reasonable. Accordingly, the courts will not enjoin or interfere with the collection of rates established under legislative sanction unless they are plainly and palpably unreasonably, confiscatory, or excessive, and clearly proved to be such, or unless there was fraud or arbitrariness in fixing such rates.

"It must be shown by a preponderance of the evidence that the legislation or rate complained of is clearly invalid, and one claiming that a rate established by a rate-making body is unreasonable, confiscatory, excessive or violative of constitutional immunities has the burden of proving it to be such."

See Cedar Rapids Steel Transportation, Inc. v. Iowa State Commerce Commission, 160 N.W.2d 825, 836 (Iowa), cert. den. 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451; In re New Jersey Power & Light Co., 9 N.J. 498, 89 A.2d 26, 31; Application of Northwestern Bell Telephone Co., 78 S.D. 15, 98 N.W.2d 170, 176; In re Northwestern Bell Telephone Co., 73 S.D. 370, 43 N.W.2d 553, 555–557; 73 C.J.S. Public Utilities § 26; 2 Am.Jur.2d, Administrative Law, § 751; 2 Pond, Public Utilities, §§ 552, 553 (4th ed. 1932); cf. San Diego Land & Town Co. v. City of National City, 174 U.S. 739, 19 S.Ct. 804, 810, 43 L.Ed. 1154; Southwestern Bell Tel. Co. v. State Corp. Com'n, 192 Kan. 39, 386 P.2d 515, 526.

And §§ 490A.13–490A.16 provide for appeal to the district court by an aggrieved party, with attendant appellate procedures.

Then § 490A.17 states:

"The court may dismiss the appeal, modify or vacate the order complained of in whole or in part, or remand the matter to the commission for such further proceedings as justice may require. The court shall have jurisdiction to compel commission action unlawfully withheld or unreasonably delayed and the court shall have the power to set aside the commission action, findings and conclusions found to be:

"1. Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

"2. Contrary to constitutional right, power, privilege or immunity.

"3. In excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

"4. Unsupported by substantial evidence in view of the entire record as submitted."

Also § 490A.19 says:

"Any party may secure a review of any final judgment of the district court by appeal to the supreme court. Such appeal shall be taken in the manner provided by law governing appeals from the district court in other civil cases."

See Elk Run Telephone Co. v. General Telephone Co., 160 N.W.2d 311, 317 (Iowa).

"Clearly a review anew is not contemplated." Nishnabotna Valley Rural Elec. Coop. v. Iowa P. & L. Co., 161 N.W.2d 348, 353 (Iowa).

In cases such as this our review is akin to those brought before us involving workmen's compensation controversies.

Looking now to Merchant v. SMB Stage Lines, 172 N.W.2d 804, 807 (Iowa), this court said:

"The commissioner's findings of fact have the effect of a jury verdict and, where the evidence is in dispute or where reasonable minds may differ on inferences fairly to be drawn from the disclosed facts, the commissioner's findings of fact are conclusive on appeal. On the other hand, if there is no dispute in the facts and different inferences could not be fairly drawn from them, a question of law is presented and the court is not bound by the commissioner's findings and conclusions. (Authorities cited).

"Our duty, then, is to determine whether there is sufficient competent evidence to warrant the decision the commissioner made, not whether there is sufficient evidence to warrant a decision he did not make. (Authorities cited).

"The commissioner, not the court, weighs the evidence, and his findings will be broadly and liberally construed to uphold rather than defeat his decision. (Authorities cited)."

See Southwestern Bell Telephone Co. v. State Corporation Commission, 192 Kan. 39, 386 P.2d 515, 525; 73 C.J.S. Public Administrative Bodies and Procedure § 216b; 2 Am.Jur.2d, Administrative Law, § 657; 43 Am.Jur., Public Utilities and Services, § 229; cf. Ruan Transport Corporation v. Iowa State Commerce Commission, 182 N.W.2d 641, 645–646 (Iowa).

▮▮ Instantly Commission is the finder of fact, it being for us to ultimately determine, (1) issues of law, (2) whether Commission acted unreasonably, arbitrarily, capriciously, in violation of applicable constitutional standards, or in excess of statutory authority, and (3) whether its findings are supported by substantial evidence of record. See Code § 490A.17, quoted above. Our limited factual review is as it should be, since Commission presumably

has at its disposal the facilities and expertise with which to appropriately resolve detailed and complicated fact questions. This means we can intercede ·only when Commission is clearly shown to have acted unconstitutionally, in violation of statutory mandate, or absent substantial support in the record. See Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 524, 88 S.Ct. 602, 621, 19 L.Ed.2d 723; Colorado Interstate Gas Company v. Federal Power Commission, 142 F.2d 943, 954 (10 Cir.); Henderson v. Jennie Edmundson Hospital, 178 N.W.2d 429, 431 (Iowa); Knudsen v. Iowa Liquor Control Commission, 171 N.W.2d 538, 540 (Iowa); Cedar Rapids Steel Transportation, Inc. v. Iowa State Commerce Commission, 160 N.W.2d 825, 831 (Iowa), cert. den. 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451; Central Maine Power Co. v. Public Utilities Com'n, 150 Me. 257, 109 A.2d 512, 514; Southwestern Bell Telephone Co. v. State Corporation Commission, 192 Kan. 39, 386 P.2d 515, 525; Village of Norwood v. Chicago & N. Ry. Co., 287 Minn. 407, 178 N.W.2d 704, 707–708; 4 Davis, Administrative Law, § 29.02 (1958); 73 C.J.S. Public Administrative Bodies and Procedure § 223; 2 Am.Jur.2d, Administrative Law, § 659. See also National Labor Relations Board v. Brown, 380 U.S. 278, 290–293, 85 S.Ct. 980, 987–989, 13 L.Ed.2d 839.

■ Furthermore, since Commission's rate fixing power is, as aforesaid, legislative in nature, we have no authority to determine whether it acted wisely in adopting any policy or plan merely because it is or is not to our liking. See In re Permian Basin Area Rate Cases, 390 U.S. 747, 790–792, 88 S.Ct. 1344, 1372–1373, 20 L.Ed.2d 312; Strong v. Town of Lansing, 179 N.W.2d 365, 367 (Iowa); State v. Social Hygiene, Inc., 261 Iowa 914, 922, 156 N.W.2d 288; Green v. City of Mt. Pleasant, 256 Iowa 1184, 1196, 131 N.W.2d 5; May's Drug Stores v. State Tax Commission, 242 Iowa 319, 327–328, 45 N.W.2d 245; Village of Norwood v. Chicago & N. Ry. Co., supra; Application of Svoboda, 74 S.D. 444,

54 N.W.2d 325, 327; Davis, Administrative Law Text, § 2.16; 73 C.J.S. Public Utilities § 64j(2) at 1161; 2 Am.Jur.2d, Administrative Law, §§ 651–652, 675, 677; cf. Young v. O'Keefe, 248 Iowa 751, 757, 82 N.W.2d 111; Wisconsin Telephone Co. v. Public Service Commission, 232 Wis. 274, 287 N.W. 122, 141–142.

■ Although the fixing of utility rates is a function over which the state, under its police power, has complete control, any determination as to reasonableness thereof is a judicial prerogative over which courts must exercise unyielding control. See 2 Pond, Public Utilities, § 548 (4th ed. 1932).

■ Of course, questions relative to constitutionality of legislation, or action of an administrative agency thereunder, and the interpretation of a legislative enactment stand as law issues determinable by the judiciary alone. See Hubbard v. State, 163 N.W.2d 904, 908 (Iowa); 73 C.J.S. Public Administrative Bodies and Procedure §§ 215, 229, 231; 16 C.J.S. Constitutional Law § 13; 2 Am.Jur.2d, Administrative Law, §§ 656, 676; 16 Am.Jur.2d, Constitutional Law, § 101; cf. Farrell v. State Board of Regents, 179 N.W.2d 533, 537–538 (Iowa). But see 2 Am.Jur.2d, Administrative Law, § 579.

■ In any event, it is not for us to engage in rate fixing, either directly or under the guise of judicial construction. See Code §§ 490A.6–490A.8, 490A.17; Iowa-Illinois Gas & Electric Co. v. Iowa City, 255 Iowa 1341, 1348, 124 N.W.2d 840; Iowa-Illinois Gas & Electric Co. v. Fort Dodge, 248 Iowa 1201, 1217, 85 N.W.2d 28; Village of Norwood v. Chicago & N. Ry. Co., supra; 1 Davis, Administrative Law, § 5.01 (1958); 3 Pond, Public Utilities, 946 (4th ed. 1932); 73 C.J.S. Public Utilities § 41a; 43 Am.Jur., Public Utilities and Services, § 83.

III. *Fair Value—State Constitutional Mandate?* Utility does not instantly claim Code Ch. 490A, more particularly § 490A.8

is, *per se,* unconstitutional. Rather it asserts, in effect, Commission's use of the "original cost or prudent investment" rate base approach is confiscatory, therefore violative of Iowa Const., art. I, § 9. Basically Utility takes the position Commission's application of "original cost", in itself, constitutes deprivation of property without due process. We cannot agree.

Admittedly Utility does not invoke U.S. Const., Amend. 14, § 1.

It still remains, however, both constitutional provisions, *supra,* are to all intents and purposes similarly phrased.

■ Unquestionably, "The Supreme Court of this state must determine the constitutional requirements in Iowa, and is not under any obligation to uphold a state statute merely because in the view of the Supreme Court of the United States it is not unconstitutional." Iowa-Illinois Gas & Electric Co. v. Fort Dodge, 248 Iowa 1201, 1224, 85 N.W.2d 28, 41.

■ Conversely, where as here constitutional provisions contain a similar guaranty, they are usually deemed to be identical in scope, import and purpose. See Farmington River Company v. Town Plan & Zoning Commission, 25 Conn.Sup. 125, 197 A.2d 653, 659; Snyder v. Town of Newtown, 147 Conn. 374, 161 A.2d 770, 774, app. dism. 365 U.S. 299, 81 S.Ct. 692, 5 L.Ed.2d 688; In re Opinion of the Justices, 246 A.2d 90, 92 (Del.); Anderson v. City of St. Paul, 226 Minn. 186, 32 N.W.2d 538, 541; 16A C.J.S. Constitutional Law § 568 c; 16 Am.Jur.2d, Constitutional Law, § 542. Compare Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 582, 62 S.Ct. 736, 741, 86 L.Ed. 1037.

■ Under these circumstances we are not bound by but may look to United States Supreme Court interpretations of the Fourteenth Amendment due process provision for such light and guidance as they may afford. Cf. Hubbard v. State, 163 N.W.2d 904, 909 (Iowa).

With this in mind some reference to decisions involving rate fixing under the Fourteenth Amendment is appropriate in determining whether, as an abstract proposition of law, use of the "original cost or prudent investment" approach is *per se* unconstitutional.

An informative analysis of all such cases, starting with Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77 (1877), to and including Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), is set forth in Utah Power & Light Co. v. Public Service Commission, 107 Utah 155, 152 P.2d 542, 546-553.

As there disclosed, Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), first fully developed the "fair value" rule as a foundation for establishment of a utility rate base. It was, at least in part, the basis for our judicial assumption of the "fair value" theory in Cedar Rapids Gas Light Co. v. Cedar Rapids, 144 Iowa 426, 120 N.W. 966 (1909), subsequently adhered to in all opinions by this court to and including Iowa Public Service Co. v. Sioux City, 256 Iowa 547, 128 N.W.2d 248 (1964).

It should be noted however, all such decisions from 1909 to 1964 were premised upon a review of rates fixed by nonadministrative municipal councils. Demonstrably we said in Iowa-Illinois Gas & Electric Co. v. Fort Dodge, *supra,* 248 Iowa 1219, 85 N.W.2d 38:

"Thus it becomes clear that we are not confronted with the usual judicial review of the independent judgment of the rate-making body in making findings of fact as required under the terms of the usual state utility commission rate statute. Iowa has no such administrative machinery and its statutes provide no review procedure."

See also 248 Iowa 1228, 85 N.W.2d 43; cf. Iowa-Illinois Gas & Electric Co. v. Iowa City, 255 Iowa 1341, 1348-1349, 124 N.W.2d 840.

But in Federal Power Commission v. Hope Natural Gas Co., *supra,* the Supreme Court reversed the Circuit Court of Appeals and upheld a Commission ordered rate base premised solely on "prudent investment" evidence, and in so doing said, at 220 U.S. 601–602, 64 S.Ct. 287–288:

"When we sustained the constitutionality of the Natural Gas Act in the Natural Gas Pipeline Co. case, we stated that the 'authority of Congress to regulate the prices of commodities in interstate commerce is at least as great under the Fifth Amendment as is that of the states under the Fourteenth to regulate the prices of commodities in intrastate commerce.' 315 U.S. at page 582, 62 S. Ct. at page 741, 86 L.Ed. 1037. Rate-making is indeed but one species of price-fixing. Munn v. Illinois, 94 U.S. 113, 134, 24 L.Ed. 77. *The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid.* (Authorities cited) It does, however, indicate that 'fair value' is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held. *The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.*

"We held in Federal Power Commission v. Natural Gas Pipeline Co., supra, *that the Commission was not bound to the use of any single formula or combination of formulae in determining rates.* Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' Id., 315 U.S. at page 586, 62 S.Ct. at page 743, 86 L.Ed. 1037." (Emphasis supplied).

■ Mindful of the foregoing, we are satisfied Iowa Const., art. I, § 9, as it relates to the administrative fixing of utility rates, does not alone preclude use by Com-

mission of the "original cost or prudent investment" standard. That view finds more than minimal support in opinions issued by the Supreme Courts of these states: Arkansas, California, Colorado, Connecticut, Florida, Georgia, Kansas, Louisiana, Maine, Michigan, Mississippi, Nevada, New Hampshire, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming. See citations, 51 Iowa L.Rev. 267, 285–294.

IV. *Fair Value—Statutory Directive?* The question next to be considered is whether Code § 490A.8 commands application of the fair value standard.

In relevant part that legislative enactment states: "In determining reasonable and just rates, the commission shall consider all factors relating to value and shall not be bound by rate base decisions or rulings made prior to the adoption of this chapter."

■ Utility argues the words "shall consider all factors relating to value" mean, in essence, Commission is by law required to apply or use all evidential factors relating to the "fair value" concept in determining a rate base. We are not so persuaded.

The issue here raised compels a construction of that part of the statute last above quoted.

Code § 4.1(2) requires, unless inconsistent with the manifest intent of the General Assembly or repugnant to the context of the statute, "Words and phrases shall be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, shall be construed according to such meaning."

■ Furthermore, we have repeatedly held, even under the rule of liberal construction, courts may not extend, enlarge,

or otherwise change the terms of a statute, but must seek always for legislative intent by what the legislature said, rather than what it should or might have said. See Radosevich v. City of Ottumwa, 173 N.W. 2d 522, 525 (Iowa); Sueppel v. City Council of Iowa City, 257 Iowa 1350, 1354, 136 N.W.2d 523; cf. Young v. O'Keefe, 246 Iowa 1182, 1186–1187, 69 N.W.2d 534.

■ Additionally, the rejection of offered amendments to a legislative act may be considered in determining intent of the legislature. To that end we may resort to legislative journals. See Socony Vacuum Oil Company v. State, 170 N.W.2d 378, 382 (Iowa); Builders Land Co. v. Martens, 255 Iowa 231, 235, 122 N.W.2d 189; Independent School Dist. of Cedar Rapids v. Iowa Emp. Sec. Comm., 237 Iowa 1301, 1308–1309, 25 N.W.2d 491.

There is nothing technical or peculiar attending use of the words *"consider* all factors relating to value" as employed in § 490A.8.

Black's Law Dictionary, (rev. 4th ed.), at 378, says "consider" means: "To fix the mind on, with a view to careful examination; to examine; to inspect."

And 15A C.J.S., at 581, states:

"In its primary sense, 'consider' has been defined as meaning to think; to examine or to inspect; to fix the mind on with a view to a careful examination; to judge; to entertain or give heed to; to deliberate about and ponder over; to give close attention to, to think deliberately about, to think on or over with care, to meditate on, to reflect upon, to revolve, to study, to ponder, as to consider the matter well before deciding."

Directly on point is this statement in the case of In re New Jersey Power & Light Co., 9 N.J. 498, 89 A.2d 26, 32:

"In the present case the Utility introduced evidence in two categories, one of which it termed historical cost and the other present value. It defined its asserted net historical cost rate base as including 'original cost of the property together with the acquisition cost (where purchased from predecessor companies) plus experienced engineering and other overhead costs excluded from original cost on the Company's books, together with the estimated cost of plant in process of construction or projected to meet existing loads and service requirements,' and its asserted present value rate base as 'the cost new either actual or estimated of the property of Appellant reflecting price levels at December 31, 1949 less allowance for loss in value due to deterioration, obsolescence and other factors.' It now asserts that the respondent rejected all the testimony and exhibits relating to the present value of its property and 'used the cost rate base.'

"The respondent was entitled to determine the probative force of the Utility's evidence upon both of its asserted rate bases. Assuming that in doing so it eliminated for valid reasons all the Utility's evidence relating to purported 'present value' as being without sufficient weight to constitute a reasonable basis for the establishment of increased rates, that fact alone would not render its decision and order invalid, for it was left with evidence of historical cost which is admissible, and if that is sufficient or substantial, competent and relevant evidence it may be considered in connection with all the circumstances of the case, for determination of a rate base. Such was the decision under comparable conditions in Railroad Comm. of Cal. v. Pacific G. & E. Co., 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319, 324–325 at p. 326 (1938), in which case the U.S. Supreme Court held that the utility could not successfully contend that it was not heard by the commission, that the evidence it offered was not received and considered and its competency and weight determined by the commission, or that the commission did not place its valuation upon the property and fix the rates upon that valuation."

See also Ingard v. Barker, 27 Idaho 124, 147 P. 293, 297; United Brotherhood of Carpenters, Etc. v. Industrial Com'n, 363 S.W.2d 82, 90–91 (Mo.App.).

An examination of the record before us reveals Commission devoted at least 18 (Record) pages to a "consideration" of Utility's fair value testimony.

Trial court also carefully weighed Commission's rate base decision, and in so doing repeated this apt statement found in Southern Bell T. & T. Co. v. Mississippi Pub. Serv. Com'n, 237 Miss. 157, 113 So. 2d 622, 644:

> "Our statute does not bind the Commission to the use of any particular formula in determining the reasonable value of the property of a public utility for rate-making purposes. Our statute merely provides that the rates prescribed shall be such as to yield a fair rate of return upon the reasonable value of the property used and useful in furnishing service, and that, the Commission in arriving at such rate base 'shall give due consideration to all elements that are generally considered in determining the rate base for rate making purposes.' There are a number of formulas which are useful in the determination of the reasonable value of a utility's property for rate-making purposes. No public utility has a vested right to any particular method of valuation. City of Fort Smith v. Southwestern Bell Telephone Company, 1952, 220 Ark. 70, 247 S.W.2d 474."

■ Moreover, "value", as the word is used in § 490A.8, cannot be reasonably equated with "fair value" as it relates to a utility rate base.

Any other holding would require that we read words and meaning into the law not there clearly expressed.

If the legislature, in enacting Code § 490A.8 had intended to establish "fair value" as a rate base standard it could easily have so stated. In other words, our General Assembly, *if so desired*, could have said: In determining reasonable and just rates, the Commission shall consider all factors relating to "fair value only", "fair value as a rate base", or words of like import, and then stopped. But that it did not do. See Simms v. Round Valley Light & Power Company, 80 Ariz. 145, 294 P.2d 378, 381; City of Cincinnati v. Public Utilities Commission, 161 Ohio St. 395, 119 N.E.2d 619, 622; Solar Electric Co. v. Pennsylvania Public Utility Commission, 137 Pa.Super. 325, 9 A.2d 447, 456; cf. Utah Power & Light Co. v. Public Service Commission, 107 Utah 155, 152 P.2d 542, 553–558.

The reasoning of other appellate courts, pertinent here, illustrates our General Assembly did not mean, by use of the word "value" in Code § 490A.8, that Commission be bound to a "fair value" rate base formula.

In Southwestern Bell Tel. Co. v. State Corp. Com'n, 192 Kan. 39, 386 P.2d 515, the Kansas Commission adopted an original cost, depreciated, rate base. The company had contended for a "fair value" rate base and presented evidence of "fair value" through use of trended original cost and cost of reproduction new less depreciation, adjusted to reflect present value. The Commission was highly critical of both methods and expounded at length on their shortcomings. The company contended the Commission had a positive duty under the Kansas statute, originally adopted in 1911, to use a fair value rate base. The company relied on Commissioner's report appended to a decision of the Kansas Supreme Court rendered in 1924, and upon the holding in that case. But the court, in *Southwestern Bell, supra*, rejected "fair value", saying at 386 P.2d 529:

> "We cannot see the logic in the Commissioner's statement made in the case. It might as well be said that if the legislature intended that only the present fair value be used, it would have charged the Commission with the 'duty to ascer-

tain the present fair value of all property.' This the legislature did not do. It would appear more reasonable to assume that the legislature charged the Commission with the responsibility of ascertaining the reasonable value of all property for rate-making purposes. It was left with the discretion of the Commission as to what method of valuation would be used."

After discussing a number of cases, the court observed at page 532:

"There were no decisions prior to 1911 that would lead the Kansas legislature to believe that *present fair value* was the only factor that could be considered in arriving at a rate base.

"We do not believe it was the intention of the legislature to restrict the use of but one factor, present fair value, in determining a rate base."

And at page 539 the court said further:

"A public utility has no vested right to any particular formula or method of valuation. Neither is the Commission bound to any particular formula or combination of formulae in determining the reasonable value of a company's property. The Commission should receive and consider all evidence which has a relevant bearing on reasonable value and then determine what formula it thinks should be used under the facts and circumstances in the case. *If the Commission finds that a rate base founded upon depreciated reproduction cost is not applicable or contains weaknesses and the finding is based upon substantial evidence, it should be free from judicial interference.*

"The district court erroneously concluded that the Commission was required by law to determine a rate base by the use of estimated reproduction cost new less depreciation or some related formulae, and erroneously concluded that the use of a rate base established by original

cost less depreciation rendered the order void as a matter of law." (Emphasis supplied).

Kentucky's statute says, in fixing value of the property the "Commission shall give due consideration to the history and development of the utility and its property, original cost, cost of reproduction as a going concern, capital structure, and other elements of value recognized by the law of the land for rate-making purposes." (Ky.Rev.Stats., Sec. 278.290). The Supreme Court there upheld the Commission's use of an investment rate base. Citizens Tel. Co. v. Public Service Commission, 247 S.W.2d 510 (Ky.).

In Michigan, where the law states the Commission "shall consider and give due weight to all lawful elements properly to be considered to enable it to determine the just and reasonable price * * * including * * * reasonable return on the fair value of all property used in the service * * *" (Mich.Comp.Laws Anno., Section 460.557), the Commission has, with court approval, used an investment rate base. E. g., Consumers Power Company, 38 PUR3d 355 (Mich.1961). In gas and telephone cases, the Michigan Commission, with approval of the Supreme Court, has employed a depreciated investment rate base method. E. g., Michigan Bell Tel. Co. v. Michigan Public Service Com'n, 332 Mich. 7, 50 N.W.2d 826, 831–832.

Mississippi, by legislative enactment, says the Commission "shall give due consideration to all elements that are generally considered in determining the rate base for rate making purposes" and rates prescribed shall yield a fair rate of return upon the reasonable value of the property (Miss.Code Anno. [1942], Sections 7716–11, 7716–12). Even so, *the Supreme Court approved the Commission's consistent use of a net investment rate base and rejection of reproduction cost as lacking in* probative value. See United Gas Corp. v. Mississippi Public Service Com'n, 240 Miss. 405, 127 So.2d 404; Southern Bell T. &

T. Co. v. Mississippi Pub. Serv. Com'n, 237 Miss. 157, 113 So.2d 622, 644, quoted *supra.*

*In Southern Bell the Mississippi Commission had admitted evidence on reproduction cost new, but after considering it, concluded the evidence was conjectural, speculative, unrealistic, and unreliable. The agency therefore rejected that evidence and fixed the rate base on original cost less depreciation, which action was affirmed by the court.*

In New Jersey, where by statute the state utility commission is required to "determine the rate base at the fair value of the property" the Supreme Court of that state sustained use of an investment rate base. See State v. N. J. Bell Tel. Co., 30 N.J. 16, 152 A.2d 35, 42–43, where the court said:

"It is now a familiar criterion that, in establishing a rate base:

" 'the Board must determine the rate base at the fair value of the property of the public utility that is used and useful in the public service at the time of its employment therein, by viewing the plant as an integral and unitary whole, considering all the elements properly entering into the ascertainment of a reasonable return for supplying the public need. * * *'

"In so doing, it has been recognized that:

" '* * * there are a number of formulae useful in determination of fair value of a utility's property for use as a rate base and that the *Board is not and should not be bound by any simple formula or combination of formulae. * * *.'"

New York's highest court, in language particularly pertinent here, approved use of an investment rate base with this statement in New York Telephone Co. v. Public Service Com'n, 309 N.Y. 569, 132 N.E.2d 847, 850:

"Thus the commission is required to receive proof of reproduction cost less depreciation as some evidence of present value in the case of utility property which, due to the unique restrictions placed upon it by law, cannot readily be valued by other usual methods, such as so-called 'market', 'sales', or 'exchange' value.

"This is not to say that the rates must be *based* upon reproduction cost less depreciation. As the commission itself states, it is under no statutory or other obligation to confine itself to consideration of any particular one of the various alternative rate bases. All that the statute says is that the commission shall 'determine the just and reasonable rates' with 'due regard, among other things, to a reasonable average return upon the value of the property actually used in the public service.' *'Due regard' to one factor 'among other things' requires consideration of that factor. It is by no means controlling.* While price indices rise in some periods, in others the general level of prices declines. *What consideration is to be given to 'value' 'among other things' is for the commission to decide,* having in mind that the overriding principle governing its primary duty is that it shall determine 'just and reasonable rates.'" (Emphasis supplied).

It must also be understood, "value in the commercial or condemnation sense cannot be used for rate making * * *." J. Bauer, Transforming Public Utility Regulation, at 170 (1950). See H. Trachsel, Public Utility Regulation, at 239 (1947); 43 Am.Jur. Public Utilities and Services, § 105.

Moreover, when considered in context or relation to other provisions of the same section, *and* chapter, it is even more

evident Utility's argument is without merit. In this regard legislative use of the ensuing phrase in § 490A.8 "and shall not be bound by rate base decisions or rulings made prior to the adoption of this chapter" distinctly negates any possible equation of the term "fair value" with the unqualified word "value". Stated otherwise, by the above quoted statutory phrase, our General Assembly explicitly expressed an intention Commission was *not* bound to use either "fair value" or "original value" as a rate base; that it, as a regulatory administrative agency, was free to legislatively use its expert judgment and in its wisdom disregard any prior decisions of this court attendant upon municipal regulation of utility rates or otherwise. See also Code §§ 490A.2, 490A.21.

This is further evidenced by the fact, our General Assembly rejected several proposed amendments to the Act, one of which would have deleted the provision, Commission "shall not be bound by rate base decisions or rulings made prior to the adoption of this chapter". See Senate Journal, Sixtieth General Assembly, February 7, 1963, pages 195, 196, 198.

In light of the foregoing it can only be concluded, Commission and in turn trial court correctly found the legislature did not intend to bind defendant regulatory agency to any single formula or formulae regarding the rate base to be employed. Under existing legislation, and within constitutional limitations, Commission was and is free to adopt any rate base method deemed appropriate for determination of value upon which to fix a return rate.

V. *Fair Value—Judicial Edict?* Utility argues, however, a rate base foundationed on "fair value" is, in this jurisdiction, indelibly impressed upon Iowa Const., art. I, § 9, by judicial fiat.

As previously stated, local utility rates were, in Iowa, once fixed by the nonadministrative governing body of each city and town.

With that limited utility rate machinery in operation, absent any evaluation or guideline standards, we did judicially prescribe the fair value approach. By so doing this court attempted to establish some degree of uniformity in utility rate fixing within the various municipalities.

Essentially we did no more than hold, *within the context*, (1) fair value was a constitutionally acceptable standard to be employed by all municipalities in each utility rate matter, (2) art. I, § 9, of our Constitution precludes confiscation of property by anything less than a fair return on investment.

Even so, a difficult if not impossible task was thereby imposed on our city governments. E. g., Iowa-Illinois Gas & Electric Co. v. Fort Dodge, 248 Iowa 1201, 1227–1228, 85 N.W.2d 28.

Some of our early pronouncements on the subject at hand did refer rather freely to due process under the Iowa Constitution. But in Iowa-Illinois Gas & Electric Co. v. Fort Dodge, *supra*, this court specifically dissipated the idea that "fair value" in utility rate cases was constitutionally mandated, by this statement in 248 Iowa at 1225, 85 N.W.2d at 42; " * * * we do not say that the Constitution of the State of Iowa requires the determination of a fair value rate base, * * *."

And in the same case at 1227–1228, 85 N.W.2d at 43–44, is this statement:

"It seems that *in a state such as ours where no state utility commission with a highly trained and skilled technical and economic staff is maintained to regulate urban utilities, a fair value rate base is the only fair and just measuring tool by which the court can determine whether or not a rate established is or is not confiscatory. To adopt the appellee city's contention of 'end result'* in this state *would under present conditions result in utter chaos.* (Emphasis supplied).

"As heretofore stated, rate making being a legislative process, no record need be kept of the council's hearings and no findings of fact need be reported. What facts would there then be to review? Courts, of course, must not surrender the power of review to determine the constitutional question of confiscation, and to accept any rate fixed by the council as factually determined without a revaluation of its basis would seem to call for a surrender of the court's function. (Authorities cited).

"*Here*, of course, *we are not favored by any fact determination* except that the council decided no rate increase was required. *The view that councils are classed as statutory commissions with administrative functions we decline to accept.* (Emphasis supplied).

"It is difficult enough, as is richly illustrated in the present case, to follow hundreds of pages of testimony of technical experts, and detailed computations of accountants and engineers, when some fairly certain guides and yardsticks are available. It would be impossible without them, which may account for some courts' apparent acts in accepting the findings of their highly trained and efficient utility commissions regardless of manner of determination or of whether or not a fair value was disclosed. Such a finding of fact under their acts may not be a denial of due process, and so unless it otherwise appears that the return is so unjust and unfair as to amount to confiscation, the court will not interfere."

See Narragansett Electric Company v. Kennelly, 88 R.I. 56, 143 A.2d 709, 717–719; Utah Power & Light Co. v. Public Service Commission, 107 Utah 155, 152 P.2d 542, 553–558.

Today intrastate utility rate fixing, a legislative function, is in this state delegated to Commission, assumably having benefit of a highly trained and skilled technical staff of experts. Procedural due process safeguards of hearing, with findings based on substantial evidence, and appellate review are provided. See Elk Run Telephone Co. v. General Telephone Co., 160 N.W.2d 311 (Iowa).

■ Utility's argument to the effect we have judicially held a "fair value" approach, in *all* utility rate fixing cases, stands forever judicially imprinted upon the due process clause of our state constitution is here and now rejected.

■ VI. *Fair Value Testimony—Consideration.* Utility also complains because Commission excluded as indefinite, uncertain, and speculative Utility's fair value testimony. In that regard Commission's action will not be held to constitute reversible error. This subject has already been briefly touched upon. At risk of repetition we again refer to United Gas Corp. v. Mississippi Public Service Com'n, 240 Miss. 405, 127 So.2d 404, where the court said at 408–409 in 127 So.2d:

"Evidence of reproduction cost new less depreciation is admissible in a hearing on a rate case, but its probative value is primarily to be determined by the Commission. It is not required to accept this opinion evidence without appraisal, but can weigh it and evaluate it.

"In the Mississippi Southern Bell Case the Commission admitted opinion evidence on reproduction cost new, but after considering it, concluded the evidence was conjectural, speculative, unrealistic and unreliable. Hence the agency rejected that evidence, and fixed that rate base on original cost less depreciation. That action was affirmed by this Court. 237 Miss. at pages 218, 227–228, 113 So. 2d at pages 644, 649."

Accord, Railroad Commission of Cal. v. Pacific Gas & Electric Co., 302 U.S. 388, 393–401, 58 S.Ct. 334, 338–341, 82 L.Ed. 319; Southwestern Bell Tel. Co. v. State Corp. Com'n, 192 Kan. 39, 386 P.2d 515, 534–535; In re New Jersey Power & Light Co., 9 N.J. 498, 89 A.2d 26, 32–37; cf.

Universal Camera Corp. v. National Labor Rel. Bd., 340 U.S. 474, 497, 71 S.Ct. 456, 469, 95 L.Ed. 456; see Wood v. Iowa State Commerce Commission, 253 Iowa 797, 803, 113 N.W.2d 710; Circle Express Company v. Iowa State Commerce Commission, 249 Iowa 651, 653–654, 86 N.W.2d 888; 73 C.J.S. Public Administrative Bodies and Procedure § 126; 2 Am.Jur. 2d Administrative Law, §§ 675, 680.

It is to us apparent Commission did "consider" all factors relating to value, but in its reasoned judgment found "fair value" evidence by Utility so lacking in probative value as to be without substance, and trial court approved.

There is to us no good cause to interfere with that finding.

VII. *Observations—Fair Value and Original Cost.* Unavoidably interwoven with the issues here presented is the approach employed by an administrative agency, under existing standards, in the initial determination of a rate base. This would appear to compel some further consideration of "original cost or prudent investment" and "fair value or reproduction cost". The many champions of each school have endlessly advanced their respective views, e. g., 2 Priest, Principles of Public Utility Regulation, ch. 4 (1969); 1 Whitten & Wilcox, Valuation of Public Service Corporations, ch. IX (2d ed. 1928); J. Bonbright, Principles of Public Utility Rates, at 276 (1961); H. Trachsel, Public Utility Regulation, at 292 (1947). See also Jacksonville Gas Corp. v. Florida R. R. & Pub. U. Com'n, 50 So.2d 887, 891–892 (Fla.); Narragansett Electric Company v. Kennelly, 88 R.I. 56, 143 A.2d 709, 717.

Actually, it would be both impractical and impossible to instantly attempt anything approaching a review of the many conflicting views on this subject. Resultantly we shall dispense with any more extended exploration of that matter than is essential.

Regarding "fair value" the court aptly stated in Market St. Ry. Co. v. Railroad Commission, 324 U.S. 548, 566–567, 65 S.Ct. 770, 779–780, 89 L.Ed. 1171:

"It was noted in the Hope Natural Gas case that regulation does not assure that the regulated business make a profit. 320 U.S. at page 603, 64 S.Ct. at page 288, 88 L.Ed. 333; see Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037. All that was held was that a company could not complain if the return which was allowed made it possible for the company to operate successfully. There was no suggestion that less might not be allowed when the amount allowed was all that the company could earn. Without analyzing rate cases in detail, it may be safely generalized that the due process clause never has been held by this Court to require a commission to fix rates on the present reproduction value of something no one would presently want to reproduce, or on the historical valuation of a property whose history and current financial statements showed the value no longer to exist, or on an investment after it has vanished, even if once prudently made, or to maintain the credit of a concern whose securities already are impaired. The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces."

Also pertinent here is this observation in Federal Power Commission v. Hope Natural Gas Co., *supra,* 320 U.S. at 601, 64 S.Ct. at 287: "The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated."

And in 1 Whitten & Wilcox, Valuation of Public Service Corporations, § 353, at 690 (2d ed. 1928), is this statement:

"The reproduction method does not fit in with depreciation and accounting

methods. The annual allowance for depreciation under approved accounting methods is not the amount required to replace the existing unit, but the amount required to write off the cost of the existing unit when it is necessary to replace it. Under approved methods the actual cost of a car when replaced is deducted from the capital account, and the cost of the new car is added to the capital account. An allowance for depreciation estimated on reproduction cost is consequently inaccurate in proportion as the reproduction cost differs from the actual cost. As long as the science of accounts is predicated on actual cost it is inconsistent and confusing, in any proceeding to determine the cost of producing service, to base the allowance for depreciation on reproduction rather than actual cost."

Finally on this subject Professor Priest said in 51 Iowa L.Rev. 283, 305–306:

"There is a vast deal to be said for the original-cost concept. It is accurate. It is practicable. It produces in short order figures which normally are not controversial. It involves materially less expense than determinations of value. And, since utility accounting is strictly supervised, original cost figures are not subject to such baleful adjectives as 'speculative,' 'conjectural,' 'theoretical', and 'imaginative'. * * *.

"Reproduction cost as such has been given a rough currying by commissions and courts for many years. * * *.

"Much reproduction-cost evidence does *not* give consideration to technological advances—they have been pulse-quickening—and the conflicting opinions of experts produced some ludicrous disparities in earlier years."

█ As applied to the case at hand we find no preponderating argument in favor of "fair value or reproduction cost" over "original cost or prudent investment" in the determination of a reasonable and just

utility rate base. Commission's decision on this point must stand.

█ VIII. *Original Cost—Inflation Factor.* We turn now to Utility's argument that adoption by Commission of an "original cost or prudent investment" rate base is *per se* unreasonable and confiscatory because it does not adequately reflect the results attendant upon inflation.

In that regard Nichols, Ruling Principles of Utility Regulation, Rate of Return, ch. 12, at 218 (1955), says:

"*Changes in economic conditions,* as indicated in an earlier chapter, *must be considered in determining a proper return allowance.* The effect of such changes is also important in considering cost of capital. At a time when interest rates and other capital charges are low, the cost of capital to a public utility company is correspondingly low. On the contrary, when capital costs are high, the utility company must pay more, to obtain capital. Questions then arise as to what capital costs shall be considered and the weight to be accorded inflation or deflation." (Emphasis supplied).

Later, Nichols & Welch, Ruling Principles of Utility Regulation, Rate of Return, Supp.A., ch. 8, at 50 (1964), stated:

"*A fair rate of return* is affected by changing economic conditions and other factors and cannot be fixed with extreme nicety. [Re Public Service Co. of North Carolina, 33 PUR3d 398 (N.C.1960)] Continuing inflation emphasizes the statement made in the original volume that *prevailing economic conditions and discernible trends for the future are factors affecting the return allowance.*" (Emphasis supplied).

"The Oklahoma commission, in fixing natural gas rates, said that the determination of rate of return, together with the determination of the rate base, constitutes the major controversial point of every rate case. Determination of the

rate base was not a major controversial point, and the commission said it chose to adjust the rate of return to reflect changing conditions, which negated the necessity for changing the theory for determining the fair value and reasonable rate base. The commission fully considered the increased cost of money and determined that a rate of return of 6.25 per cent was fair and reasonable, although the company contended for a return of 7.2 per cent and in the last case involving this company the commission had allowed a return of 6 per cent." [Re Oklahoma Nat. Gas Co., 26 PUR3d 149 (Okla.1957)].

Then at 52 is this pertinent statement:

"Inflation is a factor that cannot and must not be ignored in a rate proceeding. The Indiana commission prefers to take cognizance of such inflation by permitting the company a total dollar return that will take account of the situation in which inflation has placed it by determining the earnings requirement that will be necessary to provide for the cost of servicing funded debt, sufficient to render a return upon the common stock equity, and permit the company to attract equity capital. [Re Midwest Teleph. Co., 23 PUR3d 26 (Ind.1958)].

"The New York commission, which has approved original cost rather than reproduction cost, said that adjustment should be made for the factor of inflation in the allowed rate of return when an investment rate base is used because the cost of replacing plant cannot be determined with exactness." [Re New York Teleph. Co., 20 PUR3d 129 (N.Y. 1957)].

And in the same publication, ch. 11, at 119–120, is this informative observation:

"Efforts of utilities to protect against erosion of earnings due to such inflation have taken two paths: (1) Attempts to have rates based on a fair value rate base, or even depreciated reproduction cost; (2) attempts to seek compensation for inflation through a greater return allowance.

"There has been resistance on the part of those state commissions using the original cost rate base to giving recognition to price increases as a protection against inflation. The reasons assigned were generally as follows:

"First, only one class of investor, the equity owners, would be benefited. [Re Michigan Bell Teleph. Co., 91 PUR NS 129 (Mich.1951)]. Thus, there would be discrimination even among common shareholders, giving a 'windfall to those who purchased stock with inflated dollars as against those who purchased stock with prewar dollars.' [Re Wisconsin Electric Power Co., 93 PUR NS 97, 109 (Wis.1952)].

"Secondly, it was noted that others suffer from inflation and that regulation should not operate to discriminate in favor of utility common stockholders since investors in utilities are treated no worse nor any better than those having fixed income investments, and consumers are as much entitled to protection against inflation as utility investors. [Re New York Telph. Co., 91 PUR NS 231 (N.Y. 1951)].

"Thirdly, inflation is already recognized in utility rates through operating expense allowance." [Re Wisconsin Electric Power Co., 93 PUR NS 97 (Wis. 1952)].

Furthermore, as observed by the same authors, ch. 22, at 313:

"The Missouri commission noted that the product of a formula using original cost and rate of return to determine net operating earnings is controlled by the amounts determined to be proper for the rate base and the rate of return. The commission then said:

" 'Consequently, the commission can insure that the objectives of a particular rate case are met by adjusting any

one or both of the factors of the formula, and it is our opinion that the most satisfactory approach to obtaining that objective is to adjust the second factor (rate of return) and hold the rate base to an amount representing actual and known amounts of investment.' " [Re St. Louis County Water Co., 19 PUR3d 113, 121 (Mo. 1957)].

See also Utah Power & Light Co. v. Public Service Commission, 107 Utah 155, 152 P.2d 542, 564–565; M. Glaeser, Public Utilities in American Capitalism, at 394–402 (1957); C. Phillips, Jr., The Economics of Regulation: Theory and Practice in the Transportation and Public Utility Industries, at 291–297 (1965); J. Bauer, Transforming Public Utility Regulation, at 132, 166–170, (1950); J. Bonbright, Principles of Public Utility Rates, at 266–276 (1961).

There is to us no basis upon which to fault "rate of return" as a means by which to offset the economic effect of inflation where "original cost or prudent investment" is employed in establishing a rate base.

IX. *Rate Return.* That brings us to Utility's assertion the return allowed it by Commission, affirmed by trial court, is both (1) constitutionally confiscatory, and (2) statutorily unreasonable.

This points up the fact that some text writers and courts hold there is a line of demarcation between these two measuring standards. In so doing they take the position that under due process the rate allowed must be sufficient only to avoid confiscation, but if measured by statute alone it must ordinarily be reasonable and just. The latter patently occupies a zone above the former so far as acceptable yardsticks are concerned. See Nichols, Ruling Principles of Utility Regulation, Rate of Return, ch. 4, at 48 (1955); Nichols & Welch, Ruling Principles of Utility Regulation, Rate of Return, Supp. A., ch. 4, at 20–22 (1964).

On the other hand we inferentially equated arbitrary and unreasonable governmental action with denial of due process in May's Drug Stores v. State Tax Commission, 242 Iowa 319, 329–330, 45 N.W.2d 245. See The Code 1971, Section 490A.17; In re Northwestern Bell Telephone Co., 73 S.D. 370, 43 N.W.2d 553, 555–557; 16A C.J.S. Constitutional Law § 690 a; 16 Am.Jur.2d, Constitutional Law, § 550.

This latter view is also accorded some support by the oft cited case of San Diego Land & Town Co. v. City of National City, 174 U.S. 739, 19 S.Ct. 804, 810, 43 L.Ed. 1154, where the court said:

" * * * the judiciary ought not to interfere with the collection of rates established under legislative sanction, unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use *without such compensation*, as, under all the circumstances, is just, both to the owner and to the public; that is, judicial interference should never occur, unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property, under the guise of regulations, as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use. (Authorities cited)."

As stated by Nichols & Welch, Ruling Principles of Utility Regulation, Rate of Return, Supp. A., ch. 4, at 19 (1964):

"A rate of return should not be unreasonable, whether considered from the viewpoint of the customer, the investor, or the utility company. A balancing of investor and customer interests must be obtained.

"It is the function of the commission to consider not only the interest of the utility but that of the general public as well, since the commission stands between the public and the utility. The commission looks to the total effect or end result to both the utility and the ratepayer, which, as provided by statute, must be

the fixing of 'just and reasonable' rates to both the investor and the consumer.

"If rates produce earnings which are below a fair and reasonable level, they are unjust or confiscatory to the owners of the utility property, and if the earnings are above such a level, they are excessive or oppressive to the ratepayers. It is essential to achieve an equitable balance between investor and consumer interests."

See Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333; In re New Jersey Power & Light Co., 9 N.J. 498, 89 A.2d 26, 30–31; Wisconsin Telephone Co. v. Public Service Commission, 232 Wis. 274, 287 N.W. 122, 149; cf. Application of Northwestern Bell Telephone Co., 78 S.D. 15, 98 N.W.2d 170, 175–176; 2 Pond, Public Utilities, §§ 568, 571, 574, 581–583 (4th ed. 1932); 3 Pond, Public Utilities, § 903, at 1802 (4th ed. 1932).

Furthermore, it is self-evident a reasonable return to Utility would not be confiscatory. See In re Permian Basin Area Rate Cases, 390 U.S. 747, 770, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312; Southern Bell T. & T. Company v. Mississippi Pub. Serv. Com'n, 237 Miss. 157, 113 So.2d 622, 654–656; cf. Steinberg-Baum & Co. v. Countryman, 247 Iowa 923, 935, 77 N.W.2d 15; 43 Am.Jur., Public Utilities and Services, § 156.

 In any event Utility has failed to here establish the return allowed it by Commission is either unreasonable or confiscatory.

X. *Committed Construction.* Utility proposed that $453,186 of its projected construction program, substantially completed in 1967, or subsequent to the test year, be included in the rate base. Commission refused that request. It is now argued by Utility, trial court erroneously affirmed this action by Commission.

In disallowing that rate base adjustment, Commission stated:

"It is fundamental to a proper test year that costs (both investment and operating) and revenues match, i. e., that they be consistent with each other. Unless there is a matching of costs and revenues, the test year is not a proper one for fixing just and reasonable rates. The inclusion of costs without matching revenues will produce excessive rates. The inclusion of revenues, without the matching costs will deny the utility reasonable rates. The relationship between cost and revenues for the test period used and the validity of that relationship constitutes one of the most vital areas in the determination of just and reasonable rates.

"If actual test year costs are adjusted to include costs associated with a higher level of revenues than prevailed in the test year, it is obvious that there is an improper matching of costs and revenues, unless the revenue level is also adjusted.

"The evidence is conclusive that the level of revenues that will prevail when the proposed plant additions are actually in service is in excess of the actual test year revenues. Yet, Company would adjust plant investment upward while ignoring the revenue side of the equation—a flagrant violation of test year principles."

Instantly, Utility does not deny costs and revenues must match in a test period. Neither does it dispute validity of the rationale underlying Commission's statement, *supra.* On the contrary, Mr. Bartlett in testifying for Utility agreed, a test period must have a matching of costs and revenue.

But Utility contends this principle was not offended by its proposal to include the aforesaid amount in the 1966 rate base because most of it was invested in 1967, for a purpose which "merely improved existing service to existing customers" and "in no

way was productive of revenues". Further Utility argues, if the $453,186 "is not included in the rate base, the Company will earn no return of any kind on this non-revenue-producing investment necessary for proper service to its customers." We are not so persuaded.

As was said in Application of Montana-Dakota Utilities Co., 102 N.W.2d 329, 334 (N.D.), affirming the North Dakota Commission's exclusion from the test year rate base of plant additions subsequently placed in service:

"The fundamental error in the utility's position is that it would project investments in plant facilities into the future but would not make any allowances for a reasonably to be anticipated increase in income which the additional and more efficient facilities would produce. The utility would, in effect, apply the 1956 income to the rate base of a subsequent year to determine a fair rate of return. We are agreed that the action of the commission in deleting this item from the 1956 rate base in its computation to determine the actual rate of return for 1956 was proper."

Also dealing with this subject in Narragansett Electric Company v. Kennelly, 88 R.I. 56, 143 A.2d 709, 721, the court stated:

"The law is well settled that property not actually used and useful does not properly belong in the rate base. * * * Only the reasonable value of property which is actually being used should be included in the rate base in determining a fair rate of return. Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382."

See also 2 Pond, Public Utilities, § 606 (4th ed. 1932), and citations; cf. Application of Northwestern Bell Telephone Co., 78 S.D. 15, 98 N.W.2d 170, 177–180.

Commission's exclusion from the rate base of any projected plant construction, not finished and in use during the 1966 test year, deprived Utility of nothing to which it was then lawfully entitled. Trial court correctly affirmed Commission in this regard.

XI. *Working Capital—Offset.* It is next claimed by Utility, trial court erred in affirming Commission's holding to the effect working capital should not be added to the rate base because offset by Utility's constant property tax accruals.

On this point Commission, in holding adverse to Utility, stated:

"Staff and Company (Utility) do not differ greatly as to the amounts required for cash working capital and for materials and supplies for ordinary operation and maintenance. The combined amounts are in the range of $151,850 to $158,000. The disagreement arises, not from the exact amount, however, but as to whether any allowance for working capital is required as a rate base component under the record in this proceeding.

"If investors must provide the funds for working capital, the investors are entitled to a return on these advances and this is accomplished by including the working capital requirement in the rate base. If, however, working capital funds are available from other sources and relieve the investor of the necessity for providing them, no allowance in the rate base for working capital is required. On these principles there is no disagreement between Company (Utility) and Staff.

"The evidence shows that at all times during the test year, 1966, the 'lag' between collection and payment of property tax alone ranged between $311,411 and $549,910, or a monthly average of $424,217, a sum far in excess of either the Staff's or Company's (Utility's) working capital computation. These funds, produced by rates collected from consumers, are available to Company (Utility) for working capital purposes. Company (Utility) agrees that accrued property taxes, if available, may be used to offset the need

for a working capital allowance, but it argues that such offset may be applied only against the cash working capital component and not against the materials and supplies. We find that working capital actually provided through the lag in payment of accrued property taxes is available in an amount sufficient to eliminate the need for a working capital allowance in the rate base. We find also that Company's (Utility's) argument is untenable. We believe that such argument does not meet the fundamental rationale involved. We believe there is no distinction between the two components insofar as the credit for tax accruals is concerned because the equitable and controlling consideration is whether investors or rate payers do in fact supply the capital to Company (Utility). To the extent that the rate payers are the contributors, they are entitled to have that contribution taken into account. Therefore, we find that no allowance for either component of working capital should be included in the rate base."

■ For utility rate purposes "working capital" is commonly defined as the amount of capital *investors* are required to put into a business, over and above investment in plant and intangibles, so as to cover any gap between cash expenditures in production and delivery of the services and collection of revenues from service sales. See 2 Whitten & Wilcox, Valuation of Public Service Corporations, § 780, at 1520 (2d ed. 1928).

■ Instantly Commission held, funds supplied by others than investors, i. e., customers, provided more than enough working capital required by Utility for normal operations. That finding stands as a matter of judgment under existing facts and circumstances. See 2 Whitten & Wilcox, Valuation of Public Service Corporations, § 781, at 1524 (2d ed. 1928).

Had Commission held other than it did, Utility's customers would be unreasonably required to pay a return on funds already supplied by them in the form of prepaid taxes.

Trial court correctly affirmed Commission on this issue.

That holding is amply sustained by Pacific Telephone & Tel. Co. v. Public Utilities Com'n, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353, 371; Transcontinental Gas Pipe Line Corporation, 11 F.P.C. 94, 101 (1952); Northern Natural Gas Company, 11 F.P.C. 123, 131 (1952). See 2 Whitten & Wilcox, Valuation of Public Service Corporations, § 781 (2d ed. 1928).

■ XII. *Charitable Contributions.* Disallowance by Commission of Utility's claimed $3490 charitable contributions, as a rate base expense item, presents another issue for review on this appeal.

In support of its position Utility cites Board of Supervisors of Arlington County v. Virginia Electric & Power Co., 196 Va. 1102, 87 S.E.2d 139; Public Service Company of New Hampshire v. State of New Hampshire, 102 N.H. 150, 153 A.2d 801, 809; United Gas Corp. v. Mississippi Public Service Com'n, 240 Miss. 405, 127 So.2d 404, 416; Southwestern Bell Telephone Co. v. State Corporation Commission, 192 Kan. 39, 386 P.2d 515, 544–545; Vrtjak v. Illinois Bell Telephone Company, 32 PUR 385, 388 (Ill.1959); 1 Priest, Principles of Public Utility Regulation, ch. 3, at 83–87 (1969).

Upon the basis thereof Utility argues, Commission's holding constitutes abuse of discretion and trial court therefore erroneously upheld Commission.

To the end that this matter be placed in proper perspective, we again quote from Commission's order:

"Company in the year 1966 charged donations in an amount of $3,490 to expenses to be borne by its customers. Staff concurred in the desirability of donations as a matter of principle, but took issue with the inclusion of the donations as a charge against the rate payers.

Staff's position is that when such donations are made, they should be from the Company's earnings.

"Regulatory commissions have been on both sides of this question, but the weight of authority regards donations as chargeable against the stockholders. We believe this is the better rule. When the Company supports worthy charities and civic groups, and we trust it will continue to do so, the funds should be from the earnings and profits of the Company. The donations should not be made at the expense of the customers without their knowledge or consent. Customers make their own contributions based on their own decisions. They should not be required to make donations involuntarily through charges in their utility rates."

That was also essentially the holding in Chesapeake & Potomac Tel. Co. v. Public Service Com'n, 230 Md. 395, 187 A.2d 475, 485, where the court said:

"If charitable contributions are allowed as an operating expense of a monopoly, it amounts to an involuntary levy on the rate payers. Many courts and commissions have, on this premise, required the utility itself to bear the burden and not to pass it on to the subscribers. See Central Maine Power Co. v. Pub. Utilities Comm., 153 Me. 228, 136 A.2d 726, 731; Peoples Gas Light & Coke Co. v. Slattery, 373 Ill. 31, 25 N.E.2d 482, 498; Carey v. Corp. Comm., 168 Okl. 487, 33 P.2d 788, 794."

Accord, Re Chesapeake & Potomac Telephone Company, 57 PUR3d 1 (D.C.1964); Pacific Telephone & Tel. Co. v. Public Utilities Com'n, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353, 374–375; Re Southern New England Telephone Company, 78 PUR3d 504 (Conn.1969); Re Accounting Treatment for Donations, Dues & Lobbying Expenditures, 71 PUR3d 440 (N.Y.1967); Re Mountain States Telephone and Telegraph Company, 78 PUR3d 429 (Utah 1969); Re Cheyenne Light, Fuel & Power Company, 79 PUR3d 80 (Wy.1969).

There is to us no apparent basis upon which to hold other than that trial court correctly affirmed Commission on this issue.

XIII. *Property Taxes—Extrapolation.* The next question to be resolved relates to Utility's argument, Commission erroneously overstated Utility's operating income by understating property taxes to be deducted therefrom.

■ It stands without question, Utility's legitimate property taxes are deductible from gross operating revenue in order to determine *pro forma* the income Utility would receive under any rate schedule. Instantly it was essential these taxes be estimated because at end of the test year there had been no assessment for that period.

For this reason the known assessment for the preceding year (1965) was applied against book value so as to determine an appropriate ratio between the two. That ratio was then applied to book value at end of the test year (1966). Both Utility and Commission witnesses employed the same procedure. But a dispute ensued. On Utility's books are several items not representing physical property, sometimes referred to as "acquisition adjustments", "plant adjustments" or "write-ups". All parties agree they are *not* a lawful part of any allocated tax assessment. See The Code 1962, Section 428.24.

Here the controversy centers upon Utility's claim of error in procedural application of an arithmetical computation. Stated otherwise, Utility claims Commission's staff witness computed the *pro forma* assessment by applying the 1965 known assessment to the total property account, including write-ups of $820,919, then excluded same from Utility's plant account at end of the test year, thus effecting an improper *pro forma* property tax reduction of $35.347 for that period.

Commission's staff witness Heithoff testified, Utility's reported book value for

1965 tax purposes *included* the aforesaid "write-ups". And, in determining the ratio of plant book value to taxes for 1965, he used the figures supplied by Utility to taxing authorities. The resulting ratio was found to be 36.9712. Then in effecting the *pro forma* tax computation for 1966, Mr. Heithoff *excluded* from book value the erroneously reported 1965 "write-ups".

It is, of course understood, for rate fixing purposes, Utility cannot be permitted benefit of credit for more taxes than due at the expense of its customers. Stated otherwise, any attempt to adopt the 1965 tax payment or attendant ratio, *per se*, as the test year standard would be patently improper.

Had Commission's staff witness completely eliminated the aforesaid "write-ups" in the 1965 computation and 1966 extrapolation, Utility would have had no premise upon which to effectively complain. But by including the "write-ups" in a determination of the aforesaid 1965 ratio, then omitting same in application of that ratio to the 1966 test year the witness, and in turn Commission, manifestly reached an inaccurate and disproportionate result.

Commission's adoption of the foregoing procedure constitutes an arbitrary action, and trial court erred in affirming same.

This case must therefore be remanded to Commission for a redetermination, in accord herewith, of the *pro forma* test year property taxes properly allowable as an operating expense.

By virtue of our holding, *supra* (Division X), Utility's claimed committed construction shall not be included in the aforesaid redetermination of the *pro forma* 1966 property tax allowance.

XIV. *Rate Case Expense.* Turning now to Utility's instant rate case expenses, Commission allowed $375,000, less income tax savings of 49 percent, or $184,000, making a net expenditure of $191,000 to be amortized over a period of eight years. This amortization factor is not here involved.

But Utility says Commission, having previously found Utility is entitled to an income tax allowance of 40 percent, instantly adopts an inconsistent position.

In taking that stand, however, Utility overlooks the fact Commission here accepted Utility's book figure of $184,000 income tax savings on rate case attendant expenditures. Thus Utility is hardly in a position to now complain.

Since Utility expended the net sum of $191,000 in connection with the instant rate hearing, Commission properly utilized that figure. And there is no inconsistency in Commission's determination that for prospective rate-making purposes Utility's applicable tax is 40 percent merely because the 1965–1966 tax credits were greater.

Commission's order is neither unreasonable, arbitrary, nor against the weight of evidence. Trial court properly affirmed Commission on this point. Cf. Ohio Edison Co. v. Public Utilities Commission, 173 Ohio St. 478, 184 N.E.2d 70, 81–82.

XV. *Depreciation.* Utility also contends trial court erred in affirming Commission's holding to the effect Utility was entitled to $414,590 tax deduction for depreciation.

Here again that is the figure submitted by Utility and accepted by Commission, except as to projected construction projects heretofore resolved by us adverse to Utility. The result was a net allowance of $405,000 for depreciation.

In light of the foregoing, trial court's approval of Commission's order was appropriate and proper.

XVI. *Income Taxes.* Disallowance by Commission of Utility's proposed deduction method for deferred income taxes, affirmed by trial court, presents another controverted issue.

Under § 167, Internal Revenue Code, 1954 (26 U.S.C., § 167), a taxpayer holding property for use in trade or business, or for production of income had an optional right to use, for depreciation purposes, any one of these three basic methods: (1) straight line, (2) declining balance, (3) sum of the years digits.

Under the "straight line" method, cost of plant is allocated equally to time periods extending over its estimated useful life. Assuming an automobile costs $2000 and its useful life is five years, the depreciation would be $400 each year, or 20 percent annually.

Where the "declining balance" method is employed, the annual depreciation rate is applied to cost of property, less accumulated depreciation rather than to gross plant as in the straight line method. Under the Revenue Code, the initial first year rate can be twice that of the straight line. Using the same example, *supra*, the first year's depreciation would be $800, twice the straight line rate, or 40 percent. In the second year this 40 percent would be applied to depreciated cost of $1200 ($2000 less $800) and the tax deduction for depreciation would be $480. The same procedure would be followed during remainder of the five year life.

The "sum of the years digits" method of depreciation involves application to gross plant of the varying rates of depreciation, progressively lower each year over service life of the property. The rate for each year consists of a fraction, the numerator of which is the number of years remaining of the estimated service life, including the current year, the denominator of which is the sum of the numbers representing the total numbers of the remaining life years for each successive 12 month period over the estimated service life. Again using the example of an automobile costing $2000 with a service life of five years, the denominator in the fraction would be the sum of the years digits, i. e., 1, 2, 3, 4, and 5, which makes a total of 15. Thus the first year

provision for depreciation would be $\frac{5}{15}$, or one-third the cost, or $666. In the second year it would be $\frac{4}{15}$ of the cost, or $534. For each year of life the accrual rate progressively declines.

Since § 167 of the Revenue Code allowed liberalized depreciation deductions for tax purposes, Utility has taken advantage thereof, using sum of the years digits method.

Despite its elected system of depreciation, Utility proposed to Commission, for rate fixing purposes, Utility be allowed to "normalize" the effect of deferred income taxes, as opposed to application of the "flow-through" concept.

1 Priest, Principles of Public Utility Regulation, ch. 3, at 124 (1969), illustrates the so-called "normalization" and "flow-through" theories in this manner:

"If X Company, with $1,000,000 of depreciable plant, applies straight-line depreciation for the purpose of computing its federal income taxes, it may be allowed (for example) a depreciation deduction of $30,000, but if it uses one of the liberalizing methods, its depreciation deduction may be $60,000. Assuming a fifty per cent tax rate, X Company would reduce its current income-tax liability $15,000 by 'liberalizing'. If 'normalizing' is allowed, X will credit the $15,000 to a reserve for deferred taxes, invest it in used and useful property, and perhaps earn a return on that investment. But if 'flow-through' is required, the $15,000 will be treated as a saving and will be available for the reduction of rates."

Commission refused Utility's aforesaid proposal, opting instead to employ the "flow-through" method which recognizes, for rate-making purposes, only Federal income taxes actually paid.

In so doing Commission said:

"The 'flow-through' method is used by federal regulatory agencies and by many state commissions. In our judgment it

is the method that accords with fact and is just and equitable to consumer and utility.

"Consequently, we shall use the 'flow-through' method in this case and the expense item for deferred Federal income taxes of $69,889 will not be allowed. This treatment will only require the Company (Utility) to continue its past practices with respect to this item for as the notes to the Company's (Utility's) financial statement as well as testimony disclose, Company (Utility) has not been following deferred tax accounting practices respecting liberalized depreciation."

With regard to this issue Utility leans rather heavily on Alabama-Tennessee Natural Gas Co., 31 F.P.C. 208 (1964), aff'd sub. nom., Alabama-Tennessee Natural Gas Co. v. Federal Power Com'n, 359 F.2d 318 (5 Cir.), cert. den. 385 U.S. 847, 87 S. Ct. 69, 17 L.Ed.2d 78, and City of Alton v. Commerce Commission, 19 Ill.2d 76, 165 N.E.2d 513, 522. It also argues Federal legislation enacted *subsequent* to date of Commission's order has destroyed all basis for support of deferred Federal income taxes, citing § 441, Federal Tax Reform Act of 1969 (83 Stat. 487 *et seq.*). For reasons stated, *infra,* we deem that claim extraneous to the matter at hand.

Utility concedes, some regulatory agencies have favored the instant Commission-adopted "flow-through" concept, others the Utility-urged "normalization" approach. The choice appears to be one of policy resting with Commission, not to be disturbed by us absent abuse of discretion. See Alabama-Tennessee Natural Gas Co. v. Federal Power Com'n, *supra*, 359 F.2d at 330; Cities of Lexington, Etc. Kentucky v. Federal Power Com'n, 295 F.2d 109, 114–115 (4 Cir.).

Referring again to the Alabama-Tennessee Natural Gas Co. case, *supra*, the court there held, in effect, contrary to Utility's apparent interpretation, an agency having jurisdiction may accord consumers the benefit of accelerated depreciation via the "flow-through" approach. See 1 Priest, Principles of Public Utility Regulation, ch. 3, at 125 (1969).

As disclosed by the record, Utility will realize a true tax saving by use of "sum of the years digits" method, even if its plant accounts remain stable. But according to the record Utility is in an ever expanding state and there is every prospect of continued growth.

■ We are satisfied Commission did not abuse its discretion in electing to require use by Utility of the "flow-through" treatment of deferred Federal income taxes. That conclusion is substantiated by Alabama-Tennessee Natural Gas Co. v. Federal Power Com'n, and Cities of Lexington, Etc., Kentucky v. Federal Power Com'n, both *supra*; Cincinnati Gas & Electric Co. v. Public Utilities Com'n, 173 Ohio St. 473, 184 N.E.2d 84, 85–86; see Nichols & Welch, Ruling Principles of Utility Regulation, Rate of Return, Supp. A., at 328–337 (1964).

■■ With regard to Utility's invocation of the Federal Tax Reform Act of 1969, cited *supra,* we accord it no consideration because Commission's order is to be tested on the basis of the record made, including such Federal tax legislation as may have then been in effect. If rate orders were to be tested on the basis of events which may have occurred subsequent to the test year, or since the rate order was issued, there would never be any finality to any such hearing or attendant decision. See Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 514–515, 64 S.Ct. 1129, 1134–1135, 88 L.Ed. 1420; National Labor Relations Board v. Condenser Corp., 128 F.2d 67, 81 (3 Cir.). See also Panhandle Eastern Pipe Line Co. v. Federal Power Com'n, 143 F.2d 488, 498 (8 Cir.), aff'd 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241.

Trial court correctly approved Commission's order directing application of the

"flow-through" approach with regard to income tax treatment of Utility's plant depreciation.

XVII. *Refund Order.* Finally, Utility asserts Commission erroneously ordered a customer refund of all service charges made by Utility subsequent to November 15, 1966, in excess of rates adjudged by Commission to be reasonable, and trial court erred in affirming that directive.

This problem focuses upon certain legislative enactments.

Code § 490A.1 states, in part:

"The Iowa state commerce commission shall regulate the rates and services of public utilities to the extent and in the manner hereinafter provided.

"As used in this chapter, 'public utility' shall include any person, partnership, business association, or corporation, domestic or foreign, owning or operating any facilities for:

"1. * * *

"2. * * *

"3. Furnishing water by piped distribution system to the public for compensation."

Then Code § 490A.2 provides, *inter alia*:

"The commission shall have broad general powers to effect the purposes of this chapter notwithstanding the fact that certain specific powers are hereinafter set forth."

More to the point is § 490A.6, which says, to the extent here relevant:

"No public utility subject to rate regulation shall make effective any new or changed rate, charge, schedule or regulation except by filing the same with the commission at least thirty days prior to the effective date thereof. The commission, for good cause shown, may allow changes in rates, charges, schedules or regulations to become effective on less than thirty days' notice.

"* * *

"Whenever there is filed with the commission by any public utility subject to rate regulation any new or changed rates, charges, schedules or regulations, the commission may, prior to the effective date thereof, docket the case as a formal proceeding and set the case for hearing. The commission shall give such notice of such formal proceedings as it deems appropriate.

"After the initiation of such formal proceedings and pending the final decision thereon, the commission may, at any time before they become effective, suspend the operation of such new or changed rates, charges, schedules or regulations, but not for a period longer than twelve months from the date when they would have become effective if not suspended.

"However, a public utility shall have the right at any time after said rates, charges, schedules or regulations have been suspended for ninety days to place in effect any or all of such suspended rates, charges, schedules or regulations by filing with the commission a bond or other undertaking approved by the commission *conditioned upon the refund in a manner to be prescribed by the commission of any amounts collected thereunder in excess of the amounts which would have been collected under rates, charges, schedules or regulations finally approved by the commission.*" (Emphasis supplied).

■ Utility contends, that part of § 490A.6 quoted above, limiting Commission's rate suspension power to twelve months is applicable and alone determinative. We do not agree.

The italicized portion of that Act, *supra,* both negates Utility's claim, and by the same token supports Commission's instantly challenged action.

Adoption of the view favored by Utility would permit it an unjust enrichment at

customer expense by retention of funds collected, though adjudged excessive and unreasonable. That is to us illogical and unreasonable. See Larsen v. Pottawattamie County, 173 N.W.2d 579, 581 (Iowa).

Utility's June 22, 1966, program, effective proposed date August 1st, was ordered suspended by Commission July 18, 1966. But the matter did not end there. Rather, Utility elected to proceed with the collection of its proposed rates under a Commission approved bond, *"conditioned upon the refund in a manner to be prescribed by such Commission* (Iowa State Commerce Commission) *of any amounts collected thereunder in excess of the amounts which would have been collected under the schedule of rates finally approved by such Commission."* (Emphasis supplied).

It is at once apparent, (1) this bond provision and Code § 490A.6, qouted *supra,* are alike, (2) Commission instantly directed Utility to do nothing other than refund *any* excessive rates collected as required by law and in accord with its agreement. Cf. Application of Montana-Dakota Utilities Co., 111 N.W.2d 705, 708–709 (N.D.).

Authorities cited by Utility in support of its stand are either distinguishable or nonpersuasive.

Trial court's approval of Commission's order on this issue, and reduction of interest attendant on refunds to be made from seven percent to five percent, stands affirmed.

XVIII. We have already noted Commission was justified under this record in rejecting the fair value evidence introduced by Utility. In doing so Commission clearly announced its "philosophy" that fair value evidence should not be relied on in future rate-making cases. We repudiate this gratuitous declaration. Commission is obligated to consider such evidence under Code section 490A.8. Whether it should then be accepted and applied as having probative force is not to be determined in advance as a policy decision. It is rather a matter to be decided by Commission as the fact finder in each case as the circumstances dictate.

XIX. The contentions Utility raises here attacking Commission's findings, conclusions and order, were examined and considered in some detail by trial court.

We have in turn reviewed those findings and conclusions in light of the record and now hold, upon the issues instantly presented, Commission's action, findings and conclusions, except as elseways determined in Division XIII hereof, are neither, (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, nor (2) contrary to constitutional right, power, privilege or immunity, nor (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, nor (4) unsupported by substantial evidence in view of the entire record as submitted.

Trial court is accordingly affirmed in part, reversed in part, and this matter remanded to defendant, Iowa State Commerce Commission, for further proceedings in accord with Division XIII hereof.

Costs on this appeal are taxed to plaintiff, Davenport Water Company.

Affirmed in part, reversed in part, and remanded to defendant Commission with instructions.

All Justices concur, except REYNOLDSON, STUART and REES, JJ., dissent.

REYNOLDSON, Justice (dissenting).

The majority opinion rightly states our task in this litigation is to determine whether the Commission acted in violation of applicable constitutional standards; unreasonably, arbitrarily, or capriciously; or in excess of statutory authority. We approach the case from the standpoint of these considerations.

I. *Applicable constitutional standards.* In Iowa-Illinois Gas & Electric Co. v. Fort

Dodge, 248 Iowa 1201, 85 N.W.2d 28 (1957) this court examined in depth the application of Iowa constitutional provisions to the utility rate problem. The holding in *Fort Dodge* was reaffirmed in our subsequent rate case opinions. Iowa-Illinois Gas and Electric Company v. Iowa City, 255 Iowa 1341, 124 N.W.2d 840 (1963); Iowa Public Service Company v. Sioux City, 256 Iowa 547, 128 N.W.2d 248 (1964). The unanimous decision in *Fort Dodge* is cited in the majority opinion and, with divergent interpretations, by both parties to this litigation. No constitutional amendments in this area have been enacted since that case was filed, and it thus remains as an authoritative interpretation of the impact of Iowa constitutional guarantees on the process of rate regulation in Iowa.

Did *Fort Dodge* involve a constitutional question, and if so, how was it answered? The holding in any opinion is frequently best determined by identifying the issues which were presented to the court. The allegations of plaintiff utility's petition are in part set out in the decision (248 Iowa at 1217, 85 N.W.2d at 37):

"Plaintiff further alleged the defendant's refusal was illegal in that 'defendants have deprived, are continuing to deprive, and will deprive the plaintiff of its property without due process of law and without just compensation, all as provided by and in violation of Section 9, Article I, of the Constitution of the State of Iowa,' *thus clearly raising a constitutional issue.*" (Emphasis supplied)

The thrust of the utility's propositions on appeal constituted a complaint of inadequate weight allocation to reproduction cost. One of the propositions relied on by the defendant city on cross-appeal was,

"1. The trial court erred in refusing to take into consideration *only* evidence of original costs in considering what was a just and reasonable rate base, for the reason that only speculative opinion testimony of reproduction costs was intro-

duced by the company." (248 Iowa at 1215, 85 N.W.2d at 36)

The issues before it as defined by this court in *Fort Dodge* were stated in the opinion, 248 Iowa at 1219, 85 N.W.2d at 38:

"What, then, is the material and competent evidence the courts of Iowa should receive to determine the mixed question of fact and law as to whether or not the rates, legislatively established, are confiscatory? Must it tend to establish fair present value?"

What the court there held is this: the rate to be applied must take into consideration those factors which affect the *present* value of the *property* devoted to public use.

"* * * [A]nything less than a fair return upon the fair *value* of the *property* devoted to public use is confiscation and unconstitutional under the Constitution of the State of Iowa." (Emphasis supplied)

(248 Iowa at 1227, 85 N.W.2d at 43)

The decision further makes clear beyond dispute the property is to be valued at the time of the test period. The word *"present"* is adjectively employed to describe the property "value" sought to be ascertained and this expression appears at least 15 times in the body of the *Fort Dodge* opinion, i. e. "present value", "fair present value", "present fair value".

We may agree with the defendants and the majority *Fort Dodge* does not mandate the use of reproduction cost to determine present value. However, we did say the constitution required there be at some time a recognition of the *present* value of the *property* to avoid confiscation.

"Indeed, this court does not perceive how any calculations of depreciation, legitimate financial expenses or indeed other calculations indispensable to regulating the rates of a public utility company without violating its rights under the *due process clause* can proceed with-

out giving consideration to the somewhat baffling, but nevertheless unavoidable problems attendant upon ascertaining a rate base reflecting, *to avoid confiscation*, the fair *present* value of the property." (Emphasis supplied)

(248 Iowa at 1222–1223, 85 N.W.2d at 40)

We there indicated in the hands of qualified experts price indices and the application of trended percentages to original cost might supply the factor usually furnished by consideration of reproduction costs. We further held "original cost depreciated" is not a valid test except in a period of fairly constant dollar values "almost unknown in this generation" and we prophetically observed "[w]ith the high government debt and other spiraling costs, *new values* seem to be well established for some time to come." (248 Iowa at 1238, 85 N.W.2d at 49). Fourteen years later, today's conditions insistently compel application of the constitutional safeguards laid down in Fort Dodge. In that case and in many other rate cases we *did not* merely hold our constitution precluded confiscation of property by anything less than a fair return on *investment*, as stated by the majority. If that were true, original cost less book depreciation would have been approved by this court in *Fort Dodge*, this being the measure of that utility's investment. The opposite was true: we held our constitution required a fair return on the *present value* of the *property*. The logic of that reasoning is simply illustrated. If the state, even in the absence of constitutional provisions specifically governing condemnation, were to legislate the sole basis of damages for property to be condemned was to be the original cost less book depreciation, all would concede a violation of the Iowa Constitution, Art. I, § 9 (deprivation of property without due process). Similarly, we believe the State of Iowa cannot, without violating due process, legislatively restrict the income from identical property by using a rate base grounded solely on original cost less book depreciation.

The majority opinion quotes extensively from and relies for authority on Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). That case, which appeared to adopt an "end result" concept of rate fixing, was decided before *Fort Dodge* and was extensively analyzed and rejected by us in the latter opinion as faultily reasoned. We said it was not binding on us in construing the Iowa Constitution.

Even a cursory inspection of the record in this case, the Order of the Commission, and the trial court's ruling, forces the conclusion Commission and trial court repudiated the constitutional mandate laid down in *Fort Dodge*: the rate base adopted must give effect to inflationary or deflationary changes occurring after original costs incurred. That other jurisdictions, interpreting other constitutions, may reach the *Hope case* result should not deter us from maintaining our steadfast adherence to our own constitutional safeguards as construed by this court. In so doing, we continue pitching our tent in the cantonment where we have always sheltered and in the company of many jurisdictions holding present value may be considered, including most of our neighboring states. See State v. Southern Bell Telephone and Telegraph Company, 274 Ala. 288, 295–298, 148 So.2d 229, 236, 47 P.U.R.3d 65, 72 (1962); Application of Wilmington Suburban Water Corporation, 203 A.2d 817, 825 (Del.Super.1964), modified by State Supreme Court at 211 A.2d 602 (1964) (with same position in regard to "fair value" meaning "present fair value"). See also 26 Del.C. §§ 126, 155; Illinois Bell Telephone Company v. Illinois Commerce Commission, 414 Ill. 275, 290–291, 111 N.E.2d 329, 336–338, 98 P.U.R. (n. s.) 379, 389–390 (1953); Public Service Commission v. City of Indianapolis, 235 Ind. 70, 95, 131 N.E.2d 308, 315 (1956); Chesapeake and Potomac Telephone Company of Maryland v. Public Service Commission, 230 Md. 395, 187 A.2d 475 (1963); Minneapolis Street Railway Company v. City of Minneapolis, 251 Minn. 43, 71–72, 86 N.W.2d 657, 676 (1957); State v. Tri-State Telephone and Telegraph Company, 204 Minn. 516, 284 N.W. 294, 301

(1939); State ex rel. Dyer v. Public Service Commission, 341 S.W.2d 795, 798–799, 37 P.U.R.3d 507, 511–512 (Mo.1961); State ex rel. Olsen v. Public Service Commission, 131 Mont. 272, 276–277, 309 P.2d 1035, 1038–1039 (1957); approved in Cascade County Consumers Association v. Public Service Commission, 144 Mont. 169, 196, 394 P.2d 856, 874 (1964); Application of Skeedee Independent Telephone Company, 166 Neb. 49, 54–55, 87 N.W.2d 715, 719, 23 P.U.R.3d 471, 475 (1958); State Corporation Commission v. Mountain States Telephone and Telegraph Company, 58 N.M. 260, 276, 270 P.2d 685 (1954) interpreting N.M.Stat.Ann. § 68–5–14; State ex rel. North Carolina Utilities Commission v. Piedmont Natural Gas Company, 254 N.C. 536, 550, 119 S.E.2d 469, 479 (1961). See also G.S. North Carolina § 62–133 and State ex rel. Utilities Commission v. Lee Telephone Company, 263 N.C. 702, 140 S.E.2d 319, 323–324 (1965); Ohio Edison Company v. Public Utility Commission, 173 Ohio St. 478, 485, 184 N.E.2d 70, 76, 45 P.U.R.3d 1, 7 (1962) interpreting Ohio Revised Code § 4909.15; Scranton Steam Heat Company v. Pennsylvania Public Utility Commission, 405 Pa. 397, 402, 176 A.2d 86, 88–89 (1962); Railroad Commission v. Houston Natural Gas Corporation, 155 Tex. 502, 522, 525, 289 S.W.2d 559, 571, 573 (1956). The present *value* of the *property* not the *remaining* balance of the company's original *investment of other-era dollars* is the constitutional foundation upon which rate base must be developed in Iowa. As this case comes before us with rate restrictions imposed in violation of applicable constitutional standards, it should be reversed and remanded.

II. *Commission's conduct as unreasonable, arbitrary or capricious.*

It was obvious from the outset the Commission and its staff intended to overthrow the constitutional standards *Fort Dodge* mandated in developing a rate base. The Commission later criticized relatively inconsequential items in reproduction cost, actual depreciation, and obsolescence deduction evidence developed by experts for the utility. At the hearing, however, the position of the Commission staff was made obvious by the objection urged to testimony of plaintiff's reproduction cost experts, whose qualifications in the field were not questioned. The objection urged, "reproduction cost is not in any circumstance a relevant, material or competent factor of value * * *. The end result is what will determine whether the rates fixed by this Commission are just and reasonable * * ".

In *Fort Dodge* we noted reproduction cost less actual depreciation and obsolescence necessarily involved estimates and judgmental decisions. But we approved the method there and in later decisions as one logically employed in combination with original cost depreciated to reflect spiraling costs and to arrive at present value of the property.

The concept of reproduction cost less actual depreciation and obsolescence is well known in this and in other areas of our law. The Iowa legislature gave it statutory recognition in § 441.21(1) (b), Code, 1971 as a means of arriving at property actual value where such value could not be readily established in another way: "The assessor may consider * * * its cost, physical and functional depreciation and obsolescence *and replacement cost * * *".* Reproduction or replacement cost reduced by factors of physical depreciation and functional depreciation has been recognized as a means of arriving at actual value in tax assessment cases. Dull v. County Board of Review, Plymouth County, 260 Iowa 828, 150 N.W.2d 91 (1967); Chicago & N. W. Ry. Co. v. Iowa State Tax Com'n, 257 Iowa 1359, 137 N.W.2d 246 (1965); Deere Manufacturing Company v. Zeiner, 247 Iowa 1364, 78 N.W.2d 527 (1956).

The reproduction cost method is accepted in our insurance law as a factor in arriving at the value of property which has no recognized market value. In Britven v. Occidental Ins. Co., San Francisco, Cal., 234 Iowa 682, 13 N.W.2d 791 (1944), we collected many decisions supporting the following statement,

"These and other authorities recognize that the principal factors in determining the actual value of a building are usually the original cost, the cost of replacing it, and a proper allowance for depreciation from use, age and other like causes." (234 Iowa at 687, 13 N.W.2d at 794).

See also Group Von Graupen v. Employers Mutual Fire Ins. Co., 259 F.Supp. 934 (D.P.R. 1966).

Similarly, theoretical reproduction or reconstruction cost has been approved by this court and other authority as competent evidence in the field of tort where damages result from property destruction, State v. Urbanek, 177 N.W.2d 14 (Iowa 1970); Restatement of Torts, § 911 (1939); and in condemnation awards, 4 Nichols, Eminent Domain, § 15.41(3), p. 819–820 (3d ed. 1962).

We thus reach the issue whether basic and settled rules of evidentiary law long recognized by our decisions can be summarily rejected, now and in the future, by an "expert" Commission.

The intent and purpose of the majority of the Commission is made evident by the language of the order. "This case * * * marks the Commission's first formal opportunity to state its *philosophy* which governs the exercise of its rate-making authority * * *. The Commission recognizes that the utilities must have * * * revenues * * * to enable them to pay a reasonable return on their stockholders' *investments*. * * * The staff advocates that the Commission adopt the so-called 'prudent investment' or *'net investment'* rate base method as being the most reasonable means of determining value for rate-making purposes. * * * Under the investment rate base method, the rate base usually consists of the *original cost of the property* devoted to public service (i. e., the cost to the first person devoting the property to public service) *less accumulated depreciation* and contributions in aid of construction plus working capital * * *. [T]he legislature has authorized *us* to choose the rate base *meth-od* to be employed in Iowa * * *. [W]e find and determine that *reproduction cost* is not *probative evidence* of value and is, therefore, not a factor * * * this Commission is required to consider * * *. [T]he 'fair value' *method* is unsound, its results unreliable, and * * * is unduly time-consuming and expensive. * * * [W]e are not merely dealing with deficiencies and defects that can be cured and a probative result secured. The deficiencies and defects of reproduction costs are inherent in such appraisals and render them and the 'fair value' *method* which depends on them, unworkable and unsound." (Record Vol. I, part 1, pp. 44–66, emphasis supplied).

It is not apparent why the Commission, which now condemns reproduction cost as wasteful of time and money, did not under its rule making power (§ 490A.2, Code, 1971) promulgate its philosophy so the same could be subjected to prior judicial review. Still more obscure is Commission's reasoning that the reproduction cost method, held in *Fort Dodge* and subsequent decisions to be competent evidence when rate regulation was the responsibility of novices at the municipal level, now becomes too complex for Commission's professional experts.

Laying these inquiries aside, we consider the question of the reasonableness of Commission's approach to rate regulation. If in any other economic context we were to say to the owner of functioning and productive property he was not entitled to derive income from it for the sole reason its cost was depreciated out on his books, the unreasonableness of our edict would be obvious. Carried to its logical conclusion, this is the ultimate effect of the "net investment" rate base method adopted by Commission.

It does not suffice to say present value of a functioning plant cannot be ascertained because it is affected by rate manipulations of the regulatory body. This was the circular reasoning of the *Hope case*,

supra, quoted and relied on by the majority. It is another way of stating the income from property will affect its market value. But in the rate base field no one contends market value per se is the measure—all concede, for example, no factor of "going enterprise" or good will can be considered. This should not preclude a determination, based on sound judgment and reason, of the present value—the present intrinsic worth—of productive property by the same means value of property is ascertained in all of the other law areas (tax, insurance, tort, condemnation) where no market value is ascertainable.

The rejection of these concepts, in the light of the failure of the Commission to consider or apply any other factors to measure the strident facts of inflation or present value of these facilities, was unreasonable, arbitrary and capricious and we should so hold.

III. *Commission's conduct in excess of statutory authority.*

We agree with majority our duty is to determine whether the Commission acted in excess of statutory authority.

Section 490A.8 relevantly provides:

"Every public utility is required to furnish reasonably adequate service and *facilities.* * * * In determining reasonable and just rates, the commission *shall* consider all factors relating to *value* and shall not be bound by rate base decisions or rulings made prior to the adoption of this chapter." (Emphasis supplied)

In first construing this legislation two basic rules apply. It is a cardinal principle a statute should be interpreted in such a way as to avoid *any doubt* as to its constitutionality. Jacobs v. Miller, 253 Iowa 213, 111 N.W.2d 673 (1961); Kerr v. Chilton, 249 Iowa 1159, 91 N.W.2d 579 (1958); Gilchrist v. Bierring, 234 Iowa 899, 14 N.W.2d 724 (1944). The second principle provides when any rule of law has become established, a new statute dealing with the same subject matter, if capable of more

than one construction, will be interpreted consistently with the established law. 82 C.J.S. Statutes, § 362, p. 794; 50 Am.Jur., Statutes, § 340, p. 333.

Turning to the statute, the direction that the Commission shall consider all factors relating to "value" must indicate a valuation, among other things, of the "facilities" referred to in the same section. It seems clear the legislature was here enacting a standard beyond the mere requirement for a "reasonable and just" rate to define the boundaries of commission authority. The Montana Supreme Court, faced with the construction of analogous statutory provisions, has said:

"Any order made by the commission must be just and reasonable. What is a reasonable charge, or a just and reasonable order, must depend upon the facts in each case. What a utility is entitled to demand in order that it may have just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public * * ". (State ex rel. Olsen v. Public Service Commission, 131 Mont. 272 at 278, 309 P.2d 1035 at 1039).

We indicated in Division I the due process clause of the Iowa Constitution as construed by this court requires the rate base to be foundationed on *present* value of the *property.* This is also the interpretation given our prior case law by authorities in the field. Professor of Law Clarence M. Updegraff, in his article " 'Present Value' The Iowa Rate Base for Public Utilities— The Recent Fort Dodge Decision", 43 Iowa L.Rev. 317, said at pages 333–334:

"It is almost too obvious to state that even a public service commission statute creating a commission and delegating regulatory and full procedural authority to it, would not and could not deprive any regulated public utility of its basic constitutional rights. Prominent among these rights are those of all property owners that property may not be taken without due process, that is to say, confiscated, and all are entitled to equal pro-

tection of the laws. *Confiscation may operate by either refusing to recognize a 'present value' rate base or by refusing to allow a rate high enough to yield a fair return upon the base."* (Emphasis supplied)

A. J. C. Priest (Law Professor, University of Virginia), quoted extensively by the majority, criticized the original cost less depreciation rate base as not permitting appropriate accommodation for steadily expanding inflation. But more pertinently, he commented on chapter 490A, Code, 1971, as affected by this court's construction of our constitution:

"The subsequent (1963) statute, which authorized the Iowa state commerce commission to regulate electric, gas, communications, and water rates and services, provides that in determining utility rates, the commission 'shall consider all factors relating to value' and 'shall not be bound by rate base decisions or rulings made prior to the adoption of this chapter.' The latter declaration may not be particularly significant, since the *Port Dodge* and *Iowa City* opinions *have constitutional predicates.* Iowa seems clearly to remain a 'fair value' state." (Emphasis supplied) ("The Public Utility Rate Base", 51 Iowa L.Rev. 283, 298) (1965)

Under principles of statutory construction defined above, and the mandate of our Constitution, "value" as used in § 490A.8 must be interpreted to signify the *present* value of the property or facilities devoted by the utility to public use. Only by this construction is the statute constitutional. The Commission in the case before us made no pretext of incorporating in its rate base any concept of present value of utility's property. It does not equate its cost depreciated with value. Here is the testimony of Martin Toscan Bennett, consulting engineer and industrial economist, the Commission's expert witness:

"Under competitive circumstances, 'cost' is a good measure of 'value' *at that time,* at that place, and in that quantity. 'Fair value' is a legal term which in my observation in most regulatory jurisdictions lies somewhere *between depreciated original cost* and *present value,* however that may be measured. 'Present value' reflects the willing buyer and willing seller concept *but its most significant characteristic lies in the word 'present'.* Usually *cost is value at the time it is incurred but present value may be more or less than original cost."* (Record Volume II, part II, p. 643, emphasis supplied)

We adopt the Commission expert's definitions ignored by the Commission. The Commission's approach is to compute original cost less depreciation and the result is "value". Is cost the same as value because this Commission says it is? Admittedly, words are quicksilver slippery, but we are irresistibly reminded of a literary analogy:

" 'When I use a word,' Humpty Dumpty said, in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.'

'The question is,' said Alice, 'whether you can make words mean so many different things.'

'The question is,' said Humpty Dumpty, 'which is to be the master—that's all.' "

—Carroll, Through the Looking Glass, The Annotated Alice, 669 (1960)

The majority opinion reasons if the legislature meant "fair value" in § 490A.8 it would have so stated, and not merely used the word "value". Two observations are pertinent here. At *no place* in the section do the words "investment" or "original cost" appear, and these are the cornerstones of majority's rationale. Second, we need not refer to "actual value", "fair value", or "present value". We need only to consider the word which was used— "value"—and note its common dictionary definition, "the monetary worth of a thing." Neither the Commission nor the majority contends the relationship between depre-

ciated original cost and the monetary worth of a thing is more than coincidental. When the Commission assumes the posture depreciated original cost is the *only factor* to be used in determining value, it is not only acting unreasonably, arbitrarily and capriciously as we have said above, but in excess of statutory authority.

The legislature which by this act authorized the Commission to employ "professionally trained engineers, accountants, attorneys, and skilled examiners and inspectors" will, we suggest, be surprised to find the Commission adopting as its value measure a rate base which could be computed by any knowledgeable mathematician. Obviously this was not the legislative intent.

The clause in § 490A.8, "shall not be bound by rate base decisions or rulings made prior to the adoption of this chapter", logically means the Commission is not bound by any prior decision or ruling with regard to percentage weights to be given original cost vis-a-vis reproduction cost, or reproduction costs per se if other reasonable indices or trending factors can be expertly formulated to convert ancient original cost depreciated to present value of the property.

Insofar as they are constitutionally grounded, *Fort Dodge* and our prior rate base decisions requiring a rate base incorporating present value of the property, cannot be overruled by statute. 16 C.J.S. Constitutional Law, § 13, p. 65; 16 Am.Jur. 2d, Constitutional Law, § 58, p. 230. As the majority so aptly puts it, "questions relative to constitutionality of legislation * * * stand as law issues determinable by the judiciary alone." In so stating, we do not intimate we believe the legislature intended to overrule those decisions. Rather, we believe this legislation was enacted with full knowledge of the requirements of the Iowa Constitution as interpreted by this court.

The Commission made no attempt to arrive at the present value of the property and in its action thus violated the legislative standard. It acted in excess of its statutory authority. Stated conversely, Commission did not "consider all factors relating to value"—and the legislature, by the use of that language, surely did not intend to give the Commission carte blanche to consider *and reject* value-affecting factors.

In summary, a reading of the record reveals Commission rejected reproduction cost evidence which had probative force as a factor affecting value. The truth of the matter is this was done not because of fatal defects in utility's evidence per se but because the Commission adopted the original cost depreciated method. That method, which makes no pretense of deriving present value of facilities of the utility, does not meet the constitutional test mandated by *Fort Dodge*. The effect of the majority opinion and its language is unfortunately fourfold. First, it merely puts Commission on notice that what it has done here will not necessarily be tolerated again. Second, it deprives plaintiff utility of its constitutional right to earn income based on present value of its property. Third, it leaves this arena in a state of chaos in which neither the utilities nor the Commission will know how to chart the course of future rate litigation. Lastly, it effectively drains the constitutional life blood from the *Fort Dodge* decision without the mercy of administering the coup de grace.

For the above reasons I respectfully dissent from all that part of the majority opinion contained in Divisions I through IX. I also dissent from Divisions XI (Working Capital—Offset) and Division XII (Charitable Contributions). I concur with respect to Divisions X (Committed Construction), XIII (Property Taxes), XIV (Rate Case Expense), XV (Depreciation), XVI (Income Taxes), and XVII (Refund Order).

STUART and REES, JJ., join in this dissent.